

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-13-2007

# Chukwu v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-4068

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Chukwu v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1163.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-4068
_____

BREDAN CHIMA CHUKWU,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Respondents

_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A79-419-894)
_____

Argued: September 29, 2006
Before: RENDELL, ROTH
and JOHN R. GIBSON,* Circuit Judges.

(Opinion Filed:  April 13, 2007)

Robert A. Cini    **[ARGUED]**
Law Offices of Howard Rosengarten
853 Broadway, Suite 1011
New York, New York 10003
*Counsel for Petitioner*
*Bredan C. Chukwu*

Richard M. Evans
Paul Fiorino
Carl H. McIntyre, Jr.   **[ARGUED]**
U.S. Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC   20044
*Counsel for Respondents*
*Attorney General of the United States;*
*United States Department of Homeland Security*

_____

    **\*** Honorable John R. Gibson, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

_____

OPINION OF THE COURT
_____


JOHN R. GIBSON, <u>Circuit Judge</u>:

Bredan[1] Chima Chukwu, a Nigerian citizen, petitions for review of the order of the Board of Immigration Appeals denying Chukwu's application for asylum, withholding of removal, and relief under the Convention Against Torture. The BIA adopted the Immigration Judge's finding that Chukwu's testimony was not credible because of unexplained inconsistencies between Chukwu's testimony, prior sworn statements, and his supporting documents, and that Chukwu failed to prove his case by sufficient credible evidence. We conclude that the IJ failed to take into account record evidence that did explain many of the discrepancies on which the IJ based his adverse credibility determination. Further, the IJ did not determine whether it was reasonable to expect Chukwu to produce corroboration of the facts which the IJ found should have been corroborated. We will therefore grant review, vacate, and remand for further proceedings.

_____

[1] Mr. Chukwu's name is also spelled "Brendan" on some documents in the record

3

## I.

Chukwu arrived in this country on October 11, 2001, carrying a false United Kingdom passport in the name of George Brendon, which he had purchased in Togo. At the Miami airport, he signed a sworn statement admitting that he was not a British citizen, but stating that he was a resident of Ghana. He said that his purpose in coming to the United States was "to see somebody." When asked why he left his country, he stated: "I left, because I am finding life very difficult," and he said he would be harmed if he returned to his country. He stated that he had never been arrested before, at any time or any place.

On August 20, 2002, Chukwu filed an application for asylum and withholding of removal in which he stated that he was a Nigerian citizen, though born in Ghana, and that he feared persecution on the ground of his politics, specifically his membership in the Movement for the Actualization for the Sovereign State of Biafra (MASSOB). His application stated that he had been arrested and beaten many times because of his membership in MASSOB and that he feared that he would be "arrested, tortured or killed by the present government of Nigeria" because of that membership. He listed five specific dates on which he had been arrested.

At his hearing before the IJ, Chukwu testified that he had been born in Ghana of a Nigerian family in 1958 and had

4

moved back to Nigeria at the age of twelve. He lived in Lagos, in the southwest part of the country, and married a wife there in 1997. In 2000, he traveled some eight hours to the eastern part of the country to visit his brother in Port Harcourt, in the River State. While in Port Harcourt he joined MASSOB, which he described as an organization devoted to protecting the rights of the Ibo (sometimes spelled Igbo) ethnic group. As can be inferred from the name, the group also supports sovereignty for Biafra, an area that seceded from Nigeria in the 1960s, but was absorbed back into Nigeria after a costly civil war. Chukwu left Port Harcourt to attend a rally in support of a Biafran state on May 22, 2000, in the adjacent state of Abia. A Biafran flag was raised at the rally. When the police arrived at the rally, the crowd stampeded, and Chukwu was arrested, along with about 30 others. Because the police found a MASSOB membership card on Chukwu, they detained him and beat him. He was forced to sign a statement renouncing his membership in MASSOB before the police would release him.

Chukwu returned to Lagos, where he attended another rally on August 11, 2000. Again, the police arrived, the people panicked, and Chukwu was picked up along with others and taken to the police station, where he was detained and beaten. Again, he was only released upon signing papers renouncing MASSOB.

In September of the same year, Chukwu and his brother were sitting in a bar in Ikoyi, Lagos. Chukwu was complaining loudly about the government's arrest of Raphael Uwazurike, the leader of MASSOB. Plainclothes officers of the domestic security forces (SSS) overheard him. They arrested and searched him and found his MASSOB card. The officers then took him to a detention center and beat him until he lost consciousness. They held him for three days without giving him food or drink, except for the bread and water he was able to buy with money he had on him. As before, he was only released upon signing a paper saying he would never be a member of MASSOB again. This time, the police asked for his address.

The next time he was picked up, on February 10, 2001, he was simply walking down the street near his house in Lagos. The police asked his name, then took him in to ask him where he was on January 7, which had been the day of a clash between MASSOB and the police. He was released without mistreatment. A similar incident occurred on May 21, when police came to his house to collect him. On that occasion, police took him to the police station, but questioned and released him without beating him.

On July 24, 2001, police again came to Chukwu's house, but he was not home. They told his wife they were looking for him. On hearing this news, Chukwu decided to stay away from home. In September, he traveled to Togo

looking for a trader he knew who could supply him with a British passport. He did not find the man, so he went home to Nigeria, but came back to Togo on September 15. This time, he got the passport, and he left for the United States, traveling via Europe.

For corroborating evidence, Chukwu submitted his Nigerian passport, his MASSOB membership card and a letter from the organization confirming his membership, an affidavit from his brother Emeka corroborating his story about the arrest in the bar, and a judicial decree granting his wife's petition to divorce him. The divorce decree recited his wife's testimony that Chukwu had

> brought a bad name to the family as he is a
> member of movement for the Sovereign State of
> Biafra (MOSSOB). As a member of this group
> he has times without number been arrested and
> detained by the State Security Service. To
> forestall further arrest, the Respondent has to go
> into hiding and eventually traveled out of the
> country.

She said her love for Chukwu had "deteriorated due to this involvement with MASSOB." Chukwu also introduced correspondence from his solicitors concerning the divorce.

7

The 2001 State Department Country Report for Nigeria was also introduced. It reported that the government security forces "committed numerous, serious human rights abuses," and that "[a]rmy, police, and security force officers regularly beat protesters, criminal suspects, detainees, and convicted prisoners." It also reported that police and security forces practiced "arbitrary arrest and detention" and that they had used lethal force to quell protests or demonstrations that were perceived as becoming violent or disruptive. Chukwu also produced newspaper articles about MASSOB, and in particular, one article about the police burning down the MASSOB headquarters in Imo state.

The IJ found that Chukwu was not credible because of inconsistencies, implausibilities, and lack of corroboration for his testimony. In a short, but reasoned opinion, the BIA adopted and affirmed the IJ's decision, specifically agreeing with the IJ that "in light of the inconsistencies between the respondent's testimony, his supporting documents, and his sworn statement, and the respondent's failure [to] adequately explain the discrepancies, the respondent failed to meet his burden to establish his eligibility for the request[ed] forms of relief with sufficient credible evidence."

## II.

A grant of asylum allows an alien who is otherwise subject to removal to stay in the United States because he is a

8

refugee.  Abdulai v. Ashcroft, 239 F.3d 542, 545 (3d Cir. 2001).  A refugee is someone who is unable or unwilling to return home because of persecution or a well-founded fear of persecution for one of five particular reasons–in this case, persecution on account of political opinion.  8  U.S.C. § 1101(a)(42)(A).  To establish a well-founded fear of persecution, an applicant must show a subjective fear as well as an objectively reasonable possibility that he would suffer such persecution if he returned to his country.  8 C.F.R. § 1208.13(b)(2)(i).

Withholding of removal is a remedy distinct from asylum and confers only the right not to be deported to a particular country, rather than the right to stay in this one. Abdulai, 239 F.3d at 545.  An applicant can establish the right to withholding of removal by showing a clear probability that his life or freedom would be threatened on account of one of the protected grounds in the proposed country of removal, 8 C.F.R. § 1208.16(b); Chen v. Gonzales, 434 F.3d 212, 216 (3d Cir. 2005).  Because it is more difficult to prove a clear probability of persecution than a reasonable possibility, an applicant who fails to prove eligibility for asylum perforce fails to show entitlement to withholding of removal.  See Kibinda v. Att'y Gen., 477 F.3d 113, 123 (3d Cir. 2007).

Finally, an applicant can be eligible for withholding of removal under the Convention Against Torture if he shows

9

that it is more likely than not that he would be tortured upon return to his country.  8 C.F.R. § 1208.16(c).

Only the decision by the BIA is a "final order of removal," <u>Abdulai</u>, 239 F.3d at 548-49, subject to our review, <u>id.</u>  We therefore do not review the IJ's opinion in its own right.  <u>Id.</u>  However, where as here, the BIA adopts the findings and reasoning of the IJ, the IJ's opinion forms the substance of the final order and we must review it accordingly.  <u>Id.</u> at 549 n.2.

Where the BIA has adopted the IJ's findings, we review those findings under the substantial evidence standard, upholding them "unless any reasonable adjudicator would be compelled to conclude to the contrary."  8  U.S.C. § 1252(b)(4)(B); <u>Dia v. Ashcroft</u>, 353 F.3d 228, 249 (3d Cir. 2003) (en banc).  In particular, we will uphold the IJ's adverse credibility determinations "if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole."  <u>Chen</u>, 434 F.3d at 216.  In making an adverse credibility finding, the IJ must supply specific, cogent reasons why the applicant is not credible. <u>Gabuniya v. Att'y Gen.</u>, 463 F.3d 316, 321 (3d Cir. 2006).  The IJ's conclusions about what facts are or are not plausible must be based on the record, not on conjecture or unsupported suppositions about conditions in the applicant's country.  <u>Dia</u>, 353 F.3d at 249-50.

10

Under our case law antedating the REAL ID Act of 2005, an adverse credibility finding could be based on inconsistencies, but only if the inconsistencies related to facts at the heart of the claim, rather than to unimportant details. Gabuniya, 463 F.3d at 322. The REAL ID Act substituted a new standard, according to which credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Id. at 322 n.7 (citing Pub. L. No. 109-13, Div. B, §§ 101(a)(3) & 101(h)(2)). This particular provision of the REAL ID Act applies only to cases where the applicant applied for asylum or other relief after May 11, 2005. Id. (citing Pub. L. No. 109-13, Div. B, § 101(h)(2)). Because Chukwu applied for asylum in 2002, our pre-REAL ID Act standard applies to evaluation of the credibility determination. Consequently, only inconsistencies going to the heart of a claim will be deemed to compromise his credibility. Id.

Where the administrative decision fails to consider or mention evidence that is on its face relevant and persuasive, the proper course is to remand for further consideration by the IJ. See Caushi v. Att'y Gen., 436 F.3d 220, 227, 231 (3d Cir. 2006); Gao v. Ashcroft, 299 F.3d 266, 277 (3d Cir. 2002); Sotto v. United States, 748 F.2d 832, 837 (3d Cir. 1984).

11

A.

Our review of the inconsistencies cited by the IJ leads us to conclude that the IJ failed to take into account relevant and persuasive evidence that would not only explain the alleged inconsistencies, but would also support Chukwu's allegations of political persecution.

The first inconsistency cited by the IJ is that Chukwu claimed to have lived with his wife and child in Lagos until he left Nigeria, yet his wife testified in the divorce proceeding that he had abandoned the family in 1999. The record shows that both facts appear to be true, and they are not inconsistent with each other. Review of the record shows that the divorce was based on "Desertion," "Irresponsib[ility]," and "No more love." The gist of Mrs. Chukwu's assertions recited in the decree was that Chukwu's MASSOB activities were causing the family trouble. Since Chukwu did not join MASSOB until 2000, the activities Mrs. Chukwu complained of evidently occurred after 1999. The record is certainly consistent with Chukwu spending some time away from Lagos after 1999, as he was in Port Harcourt in 2000 when he joined MASSOB and he was arrested in Abia state in May 2000. He left his job in Lagos at the end of 1999, so he was apparently free to travel. He also testified that although he was still living with his wife in 1999, he was having some family trouble at that time and that "sometimes I would leave and travel and then come back or go to someplace and come

12

back." Yet, he also returned to Lagos in 2000, since he was arrested at a bar in Lagos in 2000 and twice in 2001 while he was at or near his house. Only when the police came to look for him at his home in July 2001, did he decide not to stay at home anymore. The record contained a letter from Chukwu's Nigerian solicitors advising him that his wife had filed for divorce on the grounds of "intermittent" and "continuous" absence:

> According to the Divorce petition, your wife is asking for the dissolution of the marriage on the grounds that you had <u>intermittently and continuously</u> abandoned her for a period of about 2 years without an exact knowledge of your whereabout [sic], and also of the fact that the federal authorities, had on several occasion [sic] detained, intimidated and harassed her on the grounds of your membership of MOSSOB.

(emphasis added). The record supports the conclusion that Chukwu was a less than attentive husband for his last two years in Nigeria, that he was traveling around the country, and that Mrs. Chukwu was aggrieved by his absences, but it does not support the conclusion that he never came home at all after 1999. Moreover, Mrs. Chukwu's assertions recited in the divorce decree substantially strengthen Chukwu's claim to have been involved in MASSOB and to have incurred the wrath of the government on account of that involvement.

13

The IJ remarked that there was no evidence that anyone else in Chukwu's family had been persecuted, but in fact the letter from the solicitors concerning the divorce proceedings recounts Mrs. Chukwu's assertions that she had been detained, harassed, and intimidated because of Chukwu's MASSOB activities. The fact that Chukwu's six siblings have not been persecuted is consistent with Chukwu's testimony that he was the only one in his family who had joined MASSOB.

The IJ also found it inconsistent that Chukwu said the police were looking for him in July 2001, yet he was able to use his Nigerian passport to cross into Togo, back to Nigeria, then again into Togo in September 2001 without being arrested or detained. Chukwu explained that Nigerian police do not have a database that would alert police in one area to the fact that police in another area were searching for a person. The IJ did not discuss this explanation or find that it was not adequate. The IJ's conclusion of inconsistency in this point seems to be based on assumptions about the capabilities of Nigerian law enforcement that have no support in the record. See Dia, 353 F.3d at 249-50 (implausibility must have support in record such as background evidence of country conditions).

The IJ also considered it problematic that Chukwu's MASSOB membership card listed an address in Imo state, which is in the east of Nigeria, rather than Chukwu's Lagos

14

address, which is in the western part of the country. The IJ stated that Chukwu had not explained why his MASSOB card had an Imo address. In fact, a newspaper article in the record showed that the address in Imo state was the headquarters of MASSOB, rather than Chukwu's address. There is no indication that the IJ was aware of this evidence.

Finally, while the IJ relied on real inconsistencies between Chukwu's airport statement and his later asylum application and testimony, we do not believe that either the IJ or the BIA meant for the decision to hinge entirely on such inconsistencies. In his airport statement, Chukwu said he was a resident of Ghana, that he had never been arrested anytime or anywhere, and that he was coming to the United States "to see somebody" and because he found life difficult. These statements conflict with his testimony that he lived in Nigeria, that he had been arrested repeatedly, and that he came to the United States to flee persecution. "It is established in this Circuit that inconsistencies between an airport statement and an asylum seeker's testimony before an IJ is not sufficient, standing alone, to support a BIA finding that the petitioner was not credible." Fiadjoe v. Att'y Gen., 411 F.3d 135, 159 (3d Cir. 2005). We cannot conclude that the IJ and BIA would have reached the same decision based on the airport statement alone, without regard to the other inconsistencies that have been explained by record evidence that went unmentioned in the IJ's opinion. See Dia, 353 F.3d at 257-58;

15

<u>Balasubramanrim v. INS</u>, 143 F.3d 157, 162-64 (3d Cir. 1998).

Because the IJ relied on inconsistencies that were explained by evidence in the record, with no explanation of why the probative evidence in the record might have been rejected, we must remand for consideration of that evidence.

B.

The IJ also based his adverse credibility determination in part on Chukwu's failure to corroborate certain aspects of his claim. Our cases follow the BIA's avowed policy of considering separately the issues of credibility and failure to provide corroboration. <u>Chen v. Gonzales</u>, 434 F.3d 212, 221 (3d Cir. 2005); <u>Abdulai v. Ashcroft</u>, 239 F.3d 542, 551 n.6 (3d Cir. 2001) (citing <u>In re S-M-J-</u>, 21 I&N Dec. 722 (1997)). In this case, as in <u>Chen</u>, "[t]he IJ seems to have impermissibly blurred the line between the credibility of a claimant and the adequacy of proof to support the claim of asylum." 434 F.3d at 221.

Corroboration of the applicant's story is not a prerequisite for relief, and the BIA may grant asylum or withholding solely on the basis of the applicant's credible

16

testimony.  8 C.F.R. §§ 1208.13(a) & 1208.16(b).[2]
Nevertheless, we have held that the failure to produce
corroborating evidence may undermine an applicant's case
where (1) the IJ identifies facts for which it is reasonable to
expect the applicant to produce corroboration, (2) the
applicant fails to corroborate, and (3) the applicant fails to

---

[2] The REAL ID Act of 2005 gives further guidance on when
corroboration is required:

> The testimony of the applicant may be sufficient
> to sustain the applicant's burden without
> corroboration, but only if the applicant satisfies
> the trier of fact that the applicant's testimony is
> credible, is persuasive, and refers to specific facts
> sufficient to demonstrate that the applicant is a
> refugee. In determining whether the applicant has
> met the applicant's burden, the trier of fact may
> weigh the credible testimony along with other
> evidence of record.  Where the trier of fact
> determines that the applicant should provide
> evidence that corroborates otherwise credible
> testimony, such evidence must be provided unless
> the applicant does not have the evidence and
> cannot reasonably obtain the evidence.

Pub. L. No. 109-13, Div. B, § 101(a)(3), amending 8  U.S.C.
§ 1158(b)(1)(B).  That provision is not applicable to asylum
applications made before the statute's effective date, May 11,
2005.  Id. at § 101(h)(2).  Thus, it is inapplicable to this case.

17

adequately explain that failure.  Toure v. Att'y Gen., 443 F.3d 310, 323 (3d Cir. 2006); Abdulai, 239 F.3d at 554.  It is reasonable to expect corroboration where the facts are central to the applicant's claim and easily subject to verification.  Abdulai, 239 F.3d at 554.  The new language of 8 U.S.C. § 1252(b)(4), added by the REAL ID Act and effective immediately upon enactment,[3] provides explicitly for deference to the trier of fact's determination on availability of corroborating evidence: "No court shall reverse a determination made by a trier of fact with respect to availability of corroborating evidence . . . unless the court finds, pursuant to section 242(b)(4)(B) [8  U.S.C. § 1252(b)(4)(B)], that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." Pub. L. No. 109-13, Div. B., § 101(e).  However, we have held that the REAL ID Act does not change our rules regarding the IJ's duty to develop the applicant's testimony, and in particular, to develop it in accord with the Abdulai steps.  Toure, 443 F.3d at 325.  We reasoned in Toure that we cannot ascertain whether the trier of fact would be compelled to find the evidence unavailable unless the applicant is given a chance to explain why he thinks it is unavailable.  Id.

---

[3] The new provision was made applicable to all cases upon enactment on May 11, 2005, Pub. L. No. 109-13, Div. B., § 101(h)(3), and so applies in this case.  See Chen, 434 F.3d at 218.

18

Where the IJ or BIA fails to engage in an inquiry and analysis establishing each of the steps required by Abdulai, we have vacated and remanded, holding that only upon such inquiry and analysis can the BIA hold the lack of corroboration against an applicant. Abdulai, 239 F.3d at 554-55; Toure, 443 F.3d at 323. Moreover, we have held that the IJ must give the applicant notice of what corroboration will be expected and an opportunity to present an explanation if the applicant cannot produce such corroboration. Toure, 443 F.3d at 324 (remanding where IJ never gave applicant opportunity to seek supporting evidence or to explain its absence); Mulanga v. Ashcroft, 349 F.3d 123, 136 (3d Cir. 2003) (remanding where IJ did not give notice prior to issuing her decision that she expected corroboration for a certain fact and did not allow applicant to explain absence of corroboration).

Chukwu did corroborate his story in part by supplying his Nigerian passport, his MASSOB card and a letter from MASSOB, his brother's affidavit concerning the incident in the bar in Lagos, his divorce decree, news stories about MASSOB's troubles with the government, and the State Department country report.

The IJ wrote that Chukwu failed to provide medical, police, or court reports to corroborate his arrests and beatings. Chukwu did not testify that he ever received medical treatment for his injuries or that he was ever charged with any

19

crime. His asylum application states that after his August 11, 2000, arrest, he was charged with unlawful assembly, but he does not indicate that he was ever convicted of that crime. Therefore, the record itself indicates that medical records documenting Chukwu's injuries probably do not exist. As to the possible police and court documents, the IJ must explain why such documents would be reasonably available to Chukwu.[4] See Mulanga, 349 F.3d at 134 (citing Qiu v. Ashcroft, 329 F.3d 140, 1553-54 (2d Cir. 2003)). Furthermore, the IJ must permit Chukwu to explain why he has not produced such evidence. Toure, 443 F.3d at 324-25. The record does not show that the IJ satisfied the requirements imposed by our case law before penalizing Chukwu for failure to produce medical, police, and court documents to corroborate his testimony about arrests and beatings. Moreover, Chukwu did produce a corroborating affidavit from his brother averring that, following the incident at the bar in Lagos, police took Chukwu away and he was released after "having been thoroughly beaten, tortured, and dehumanized."

The IJ also stated, "Respondent has presented no evidence whatsoever to indicate when he became a member of

---

[4] In this regard, it may be relevant that the government attempted in 2002 to obtain from the Nigerian government verification of authenticity of two of Chukwu's documents. We understand that no reply was ever received.

20

MASSOB."  To the contrary, Chukwu did testify that he joined MASSOB in January of 2000.  He introduced his membership card and a letter from MASSOB stating that he is a member.  Admittedly, neither shows a membership date, but again, the affidavit from Chukwu's brother states that in the September 2000 incident in the bar, the SSS officers searched Chukwu and found a MASSOB identity card on him.  This is evidence that Chukwu was a member of MASSOB during at least one of the events of persecution.  Furthermore, Mrs. Chukwu's assertions in the divorce decree indicate that Chukwu was a member of MASSOB at the times he was arrested.  Nothing in the record indicates that the IJ informed Chukwu that the date he joined was in doubt or of particular interest, and therefore Chukwu neither had notice that corroboration of the date would be expected of him nor a chance to explain why he did not produce documentation showing the date he joined.  The IJ thus failed to satisfy the Abdulai analysis before penalizing Chukwu for failing to corroborate his date of membership.  Accordingly, we must remand for a new corroboration determination, giving Chukwu an opportunity to explain why he has not produced the documents the IJ considered important.  See Toure, 443 F.3d at 325.

## C.

The IJ's opinion adverted to some doubt as to whether, even if Chukwu's contentions about his arrests were correct,

21

the treatment described would amount to persecution. It is difficult to ascertain whether the IJ was assuming the testimony about the beatings was correct as well as the testimony about arrests, since the IJ stated in the same sentence that he was "not satisfied that the treatment [Chukwu] received has either been truthfully relayed here in Court or that that treatment would rise to the level of persecution . . . ." In any case, the BIA did not appear to adopt the conclusion that the beatings Chukwu described would not rise to the level of persecution, relying instead on the inconsistencies in his testimony. Since the BIA did not rely on the ground that the beatings were not severe enough, we may not rely on it, either. "It is a bedrock principle of administrative law that judicial review of an agency's decision is limited to the rationale that the agency provides." Konan v. Att'y Gen., 432 F.3d 497, 501 (3d Cir. 2005). We will remand for further elucidation as to whether the beatings, if the BIA finds them to have occurred, rise to the level of persecution. See Voci v. Gonzales, 409 F.3d 607, 614-16 (3d Cir. 2005) (discussing when beatings rise to the level of persecution).

***

We will GRANT the Petition for Review of the order of the BIA, VACATE the order, and REMAND for further proceedings consistent with this opinion.

22