

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-27-2009

# Lin v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-2308

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Lin v. Atty Gen USA" (2009). *2009 Decisions*. Paper 1982.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1982

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-2308
_____

MAO CHENG LIN;
WEN QING JIANG,

Petitioners

vs.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency Nos. A70-898-926 & A75-817-419)
Immigration Judge: Honorable Craig De Bernardis

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 21, 2009
Before: <u>Chief</u> <u>Judge</u> SCIRICA, CHAGARES and WEIS, <u>Circuit</u> <u>Judges</u>
Opinion Filed: January 27, 2009

_____

OPINION
_____

PER CURIAM.

Petitioner, Mao Cheng Lin, a native and citizen of Fujian Province, the

People's Republic of China, entered the United States on April 5, 1993, without

authorization and applied for asylum in June 1993.  He and his wife, Wen Qing Jiang,

were married in the United States and have two American born-children.[1]  Lin was issued

a Notice to Appear on September 1, 1998.  In response, he filed a supplemental asylum

statement and applied for withholding of removal, relief under the Convention Against

Torture ("CAT"), and voluntary departure.  He claimed that he was persecuted for his

political beliefs and his participation in pro-democracy demonstrations in Fujian province

that coincided with those that occurred at Tiananmen Square in 1989.

When he applied for asylum in 1993, Lin claimed that he had heard about the student

democracy movement in Beijing in 1989, when he was a high school student in Fuzhou

City.  He was so inspired by stories of students there fighting for democratic principles

that he joined the local student association in Changle City.  There, he organized

classmates, friends and relatives to support the students in Beijing.  He wrote articles,

gave speeches, and organized protest marches.  He heard news of the Tiananmen Square

massacre that occurred on June 4, 1989, and was filled with grief and indignation.

Sometime after June 4, the local authorities detained Lin for three days.  He refused to tell

them about his political activities.  As a result of his involvement in the student

democracy movement, Lin was not permitted to return to his local school and no other

school would accept him.  Because there was no future left for him in China, he took a

---

[1]  Jiang arrived in the country in 1998.  Although she is a co-petitioner, she is seeking relief as a derivative beneficiary of her husband's applications.  Accordingly, we will refer only to Lin's claim in our analysis.

friend's suggestion and fled to the United States because "[t]his was the only way [that] could let me have a better life." He believed that he would be persecuted for his student democracy movement activities if he returned to China and he would also be punished for escaping from China without permission.

In his counseled asylum statement filed in October 1998, Lin claim that, "under the leadership of his high school teacher," he and his classmates participated in a local demonstration in Fuzhou City on June 4, 1989, to support the students of Tiananmen Square. When the demonstration became "very heated," the Chinese authorities arrested Lin and his classmates, blind-folded them, and drove them to a jail several hours away. He claimed that the police "beat us up" and attempted to extract confessions from them. Lin and his best friend were beaten on the first day of detention and on the following day because they refused to confess. Lin suffered a head injury from one of the beatings (in which he was hit with an iron shovel) that left him unconscious until the next day. He was not given any food for several days. During his detention, the police visited his parents and threatened them. Lin was released after spending two weeks in jail. The police kept him under constant surveillance thereafter and brought him into the station for questioning on occasion. Lin's aunt and uncle arranged for him to be smuggled out of China so that he could get to the United States. He stated that if he and his wife returned to China, they would be jailed and interrogated.

3

At his removal hearing on April 19, 2000, Petitioner testified on direct examination consistent with his 1998 statement as to his participation in the student demonstration, his subsequent arrest and beatings, and the length of his detention (two weeks) in June 1989.[2] He testified for the first time that the police detained him "for a day or two" when they brought him in for questioning from 1989 through 1993. He claimed that he would be arrested on his return to China because he left the country illegally and because he has "other cases against me that haven't been taken care of." A.R. at 123.

On cross-examination, Lin acknowledged the newness of his claim that the police interrogated his parents during his detainment in June 1989, as he did not raise the claim in his 1993 and 1998 written statements or in his interview with the asylum officer in August 1998. In response to the IJ's questioning, Lin gave varied testimony as to how many times he was arrested and detained from 1989 through 1993, finally settling on twelve times, a fact that he did not include in his written statements or asylum interview. Lin also testified for the first time, on cross-examination, that he was beaten during his periodic detentions from 1989 to 1993. When asked why he omitted these claims from his earlier statements, Petitioner stated, "maybe I forgot" and "I have a problem with my brain so I forget things." He claimed to have documentary evidence of his head injury

---

[2] Lin was twenty-nine years old when he testified in 2000. The Oral Decision mistakenly described Lin as a forty-nine year old man.

4

and of his detention in June 1989, but he produced none for the record. He admitted that he arranged for his wife to come to the United States so that he could marry her here because he was not old enough to obtain a marriage license in China.

The Administrative Record contains the State Department's Profile on Asylum Claims for China and its Country Report on China for 1999. These reports state that the student demonstrations that occurred in Fujian Province in June 1989 were smaller and less dramatic than those in Beijing. The crackdown resulted in fewer arrests and heavy military force was not used. Local government and educational authorities showed substantial flexibility in dealing with the student demonstrators. Although China did detain some political activists post-Tiananmen Square, from 1989 through 1999, it did so only in large cities, like Beijing and Shanghai.

The Immigration Judge ("IJ") denied asylum, withholding of removal and CAT relief, rejecting Lin's testimony as incredible. The IJ based his finding on discrepancies between Lin's testimony and his prior statements and the State Department's Country Report for 1999. The IJ disbelieved Lin's account of his arrest and beatings in June 1989, because it differed markedly from his 1993 statement. In his 1993 statement, Lin claimed that the police questioned him a few days after Tiananmen Square and that he was held in custody for three days. He did not say anything about being beaten. The IJ rejected Lin's testimony that he was beaten by the police during his detentions from 1989 through 1993, because he did not raise the claim in his 1993 and

5

1998 written statements or on direct examination. IJ Op. at 9-10. The IJ also noted that Lin's testimony concerning his random detentions in Fujian Province from 1989 through 1993 contradicted the State Department's Country Report that detentions of this sort were limited to large cities, such as Beijing. Moreover, the IJ pointed out that Lin testified that it was his high school teacher who led him to participate in the demonstration. He no longer claimed, as he did in 1993, that he was a leader in the student movement in Fujian Province, and thus, it was far less likely that authorities would consider him a political activist. Ultimately, the IJ found that Lin could not provide a consistent, convincing narrative of events from June 1989 until he fled in 1993. The IJ granted Lin's application for voluntary departure, declining to find that his inconsistencies were deliberate.

On August 19, 2002, the Board of Immigration Appeals ("BIA") affirmed the IJ's decision without opinion. In November 2007, the BIA granted Lin's motion to reissue the 2002 order, based on former counsel's failure to inform him of the decision. The 2007 order never reached Lin or his attorney because it was sent to the wrong address. In January 2008, Lin applied, pro se, for re-issuance of the 2002 order. The BIA granted his request and, on April 15, 2008, it entered an order reissuing again its August 19, 2002 decision. Petitioner filed a timely petition for review.

We will deny the petition. We have jurisdiction to review final orders of the BIA under section 242(a)(1) of the INA, 8 U.S.C. § 1252(a)(1). When the BIA affirms the IJ's decision without opinion, we examine the IJ's decision. See Partkya v.

6

<u>Attorney General</u>, 417 F.3d 408, 411 (3d Cir. 2005). We review the factual findings of the IJ, including adverse credibility findings, for substantial evidence. <u>Abdulrahman v. Ashcroft</u>, 330 F.3d 587, 597 (3d Cir. 2003). Under the deferential substantial evidence standard for review, the BIA's findings must be upheld unless the evidence not only supports a contrary conclusion, but compels it. <u>Xie v. Ashcroft</u>, 359 F.3d 239, 243 (3d Cir. 2004) (<u>quoting</u> INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B)). "In making a credibility determination, the IJ must provide 'specific, cogent reasons[s]' why the applicant is not credible." <u>Id</u>. (citation omitted). We must evaluate whether the credibility determination was "appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence on country conditions. <u>Chen v. Ashcroft</u>, 376 F.3d 215, 223 (3d Cir. 2004). Only inconsistencies going to the heart of Lin's claim will be deemed to compromise his credibility.[3] <u>Chukwu v. Attorney General</u>, 484 F.3d 185, 189 (3d Cir. 2007).

Lin asserts that the inconsistencies in his testimony were the result of his being upset and flustered during the hearing. Citing to his testimony on direct

_____

[3] Section 101(a)(3) of the REAL ID Act allows the trier of fact to consider any inconsistency, inaccuracy or falsehood in an asylum applicant's written or oral statements, regardless of whether the discrepant statements go "to the heart of the applicant's claims." This provision, however, "applies only to cases where the applicant applied for asylum or other relief after May 11, 2005," and accordingly does not apply in this case. <u>Chukwu v. Attorney General</u>, 484 F.3d 185, 189 (3d Cir. 2007).

7

examination, Lin maintains that the essence of his story remained the same - that he was arrested for participating in pro-democracy demonstrations, that he was physically struck in the head by police during his two-week detention, and he was repeatedly interrogated by the police from 1989 through 1993. Lin also challenges the IJ's speculation that, if Lin was struck on the head by a policeman wielding a baton at the demonstration on June 4, 1989, the incident did not constitute persecution because it was not directed at Lin. Lin argues that the police were targeting him personally because he drew attention to himself by yelling pro-democracy slogans at the demonstration. He contests the IJ's finding that, based on the 1999 State Department Country Reports, there was no objective evidence showing that a reasonable person in Lin's circumstances would fear persecution if he was returned to China. Lin points to the State Department Report on China for 2008, which indicates that China's human rights record was poor and that it continued to arrest former political prisoners as punishment for their activities, and continued to practice surveillance, harassment and the detention of citizens around politically sensitive events, including the anniversary of Tiananmen Square.

After careful review of Lin's 1993 asylum application, his additional statement filed in 1998, and his testimony, and all of the other items in the record, we can only conclude that we must uphold the IJ's adverse credibility determination, as the IJ gave specific, cogent reasons for disbelieving Lin. 8 U.S.C. § 1252(b)(4)(B). The IJ duly noted that Lin's answers on cross-examination and in response to questioning by the IJ,

8

indicate that, at its core, his story was not consistent.  The discrepancies highlighted by the IJ regarding Lin's arrest and detention in June 1989, and his treatment by police from 1989 through 1993, go to the heart of Lin's asylum claim.  His statements and testimony, as set out above and in the IJ's oral decision, contain inconsistencies and omissions, which, taken together, call his credibility into question.  As the IJ duly noted, Lin's earliest account of what happened to him in China, the 1993 statement, is significantly different from his 1998 asylum statement as to the circumstances surrounding his arrest, the length of detention in June 1989 and whether he was beaten or not.  Moreover, Lin added wholly new claims at his hearing, that his parents were interrogated in June 1989, and that he was subjected to random detentions and beatings from 1989 through 1993.  Based on the record, the conclusions of the IJ are supported by substantial evidence.  See Xie, 359 F.3d at 243.  We cannot say that any reasonable adjudicator would be compelled to conclude to the contrary.

Because Lin failed to satisfy the lower burden of proof required for asylum, he is necessarily ineligible for withholding of removal.  See Immigration & Naturalization Services v. Cardoza-Fonseca, 480 U.S. 421, 430-32 (1987).  Moreover, the IJ determined that Lin did not meet his burden of establishing that it is more likely than not that he will be tortured upon his return to China, 8 C.F.R. §§ 208.16, 208.18, and we conclude that the record does not compel a different conclusion.

9

Lin claims an additional ground for asylum based on the strict enforcement of China's one-child policy in Fujian Province. In 2003, Lin's wife gave birth to their second child. Because they now have two sons, Lin claims that he or his wife would be subjected to forced sterilization if they returned to China. The government argues that the claim is not exhausted. We agree. The Court's jurisdiction is limited under § 242(d)(1) of the INA to cases where the petitioner "has exhausted all administrative remedies available as of right . . . ." 8 U.S.C. 1252(d)(1); see Abdulrahman v. Ashcroft, 330 F.3d 587, 594-95 (3d Cir. 2003). A petitioner has exhausted his administrative remedies if he raises all issues before the BIA. Although the exhaustion principle is not applied "in a draconian fashion," "[o]ut of respect for the administrative process, we will not require the BIA to guess which issues have been presented and which have not." Lin v. Attorney General, 543 F.3d 114, 122 (3d Cir. 2008). Even if a petitioner does not exhaust a claim, this Court may still have jurisdiction to consider it, if the BIA sua sponte addressed the issue on its merits. Id. at 122-23.

We conclude that the BIA was not given sufficient notice of Lin's claim that he and his wife would be subjected to coercive family planning measures because they have two American born sons, a violation of the one-child policy. Lin mentioned that he or his wife could suffer persecution under Fujian Province's coercive family planning policies in his "motion to reopen and reissue an order," filed in the BIA on June 6, 2007. He attached an affidavit, stating that he and his wife would be subjected to

10

forced sterilization, and provided the birth certificates of his sons, born in 1999 and 2003. Lin's counsel, however, failed to request that the removal proceedings actually be reopened for the BIA to consider remand to the IJ for consideration of the new claim based on changed circumstances.[4] The BIA did not address the new claim or reach it <u>sua sponte</u> in its order reissuing the original order of removal. Thus, we lack jurisdiction to review the unexhausted claim. We note that Lin may be able to exhaust his claim by filing a motion to reopen to the BIA, seeking a remand to the IJ to consider his coercive family planning claim due to changed circumstances. We, of course, offer no appraisal of the merits of any such motion.

Accordingly, we will deny the petition for review.

---

[4] According to Lin, his attorney filed the motion to reopen on June 1, 2007, weeks before he resigned from the California Bar. A.R. at 9.

11