OPINION OF THE COURT
PER CURIAM.
Xia Lin petitions for review of the Board of Immigration Appeals’ (“BIA”) final order of removal. For the following reasons, we will grant her petition.
I.
Lin, a native and citizen of China, arrived in the United States in March 2006 when she was eighteen years of age. She did not have a valid entry document, and the Government commenced removal proceedings against her on that basis. Lin concedes removability, but seeks asylum, withholding of removal and relief under the Convention Against Torture (“CAT”) on the grounds that she fears mistreatment for her practice of Falun Gong.[1]
The substance of Lin’s testimony before the Immigration Judge (“IJ”) is as follows. (A.82-110.) Lin and her parents practiced Falun Gong, and Lin helped them hand out Falun Gong fliers in public. On November 13, 2005, Lin was handing out fliers when she received a call on her cellular phone from a neighbor, who had just seen four Chinese policemen arrest her parents at their home. The neighbor told Lin that the police had asked him and her parents for Lin’s whereabouts so that they could arrest her too, and that she should run away. Lin fled to an aunt’s house. Authorities detained Lin’s parents for approximately one month (and, according to Lin’s affidavit, beat and interrogated them during that time). Lin stayed with her aunt for another three months after that, then fled to the United States at her mother’s urging. In addition to her testimony, Lin submitted a letter from her mother largely corroborating her account, the 2006 country report, and various articles describing the Chinese government’s mistreatment of Falun Gong practitioners.
The IJ opened Lin’s hearing by acknowledging that the only matter in dispute was whether Lin is “a bonafide Falun Gong practitioner,” because, if so, the “country background” establishes that she would face persecution in China. (A.81.) The IJ denied relief, however, because she found that Lin was not credible and failed to provide sufficient corroboration. The Board of Immigration Appeals (“BIA”) adopted the IJ’s decision and added to it by emphasizing certain provisions of the REAL ID Act of 2005. Lin petitions for review.
II.
A.
We have jurisdiction under 8 U.S.C. § 1252(a)(1). “Because the BIA adopted the IJ’s adverse credibility determination *790 and added to that conclusion, we consider both the IJ’s decision and that of the BIA.” Kaita v. Att’y Gen., 522 F.3d 288, 296 (3d Cir.2008). “This court reviews adverse credibility determinations under the substantial evidence standard,” and may not disturb them unless “ ‘any reasonable adjudicator would be compelled to conclude to the contrary.’” Id. (citation omitted). “Although our review of a credibility finding is generally deferential, ‘that deference is expressly conditioned on support in the record,’ ” Gabuniya v. Att’y Gen., 463 F.3d 316, 321 (3d Cir.2006) (citation omitted), and “ ‘adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible,’ ” Kaita, 522 F.3d at 296 (citation omitted).
In addition, although the IJ may reasonably expect corroboration of certain points, IJs have a duty to develop the record, and thus may deny a claim for lack of corroboration only when “(1) the IJ identifies facts for which it is reasonable to expect the applicant to produce corroboration, (2) the applicant fails to corroborate, and (3) the applicant fails to adequately explain that failure.” Chukwu v. Att’y Gen., 484 F.3d 185, 191-92 (3d Cir.2007).[2]
B.
We note initially that the IJ took over much of Lin’s direct examination and examined her aggressively at times. Lin does not argue that the IJ’s conduct by itself warrants relief, and we do not believe that it does; the IJ did not exhibit the level of intemperance or apparent partiality that we have condemned in other cases, see, e.g., Fiadjoe v. Att’y Gen., 411 F.3d 135, 154-57 (3d Cir.2005), and, with the exceptions discussed below, her questioning generally did not prevent Lin from establishing her case, cf. Kaita, 522 F.3d at 301. The tenor of the IJ’s questioning, however, together with the substance of her conclusions, might leave one with the impression that she was seeking justifications to deny Lin’s claims. We pause here to reiterate that “ ‘the procedures for requesting asylum and withholding of deportation are not a search for justification to deport.’ ” Mulanga v. Ashcroft, 349 F.3d 123, 135 (3d Cir.2003) (citation omitted).
The IJ based her decision on the “totality of the circumstances,” (IJ Dec. at 11, A.57), and relied on six grounds in particular, the first three going to Lin’s credibility and the remainder going to the issue of corroboration. It is not clear whether the IJ or BIA would have viewed any one or more of these grounds as dispositive in the absence of the others. Thus, we likely would be required to remand even if only one of these grounds were insupportable. See Chukwu, 484 F.3d at 191. As it turns out, however, the IJ’s reliance on each of these six grounds either lacks record support or is otherwise problematic.[3]
*791 The first two grounds relate to the date of Lin’s parents’ arrest. First, the IJ relied on a perceived inconsistency between Lin’s testimony that she was handing out fliers on that day, which she testified was a Friday, and what the IJ believed was Lin’s previous testimony that she handed out fliers only on Tuesdays. That was not Lin’s testimony. Lin first testified that she handed out fliers “about once per week.” (A.85.) The IJ then took over this line of questioning from counsel, and asked Lin: “What day of the week did you usually pass out the fliers, what day of the week? You said once a week. What day of the week did you pass out the fliers?” (A.87) (emphasis added). Lin answered: “Tuesday.” (Id.) She went on to testify, however, that her parents were arrested on a Friday, and that she had been handing out fliers that day. (A.92.) The following then transpired:
Q. You earlier said you passed out fliers on Tuesdays. You also said you passed out fliers only once a week. So now why are you passing them out on Friday?
A. Because sometimes they came on Tuesdays, sometimes they came Friday. And I only, only hand out fliers after (indiscernible).
Q. But why didn’t you testify earlier that you also passed them out on Fridays? You testified here today that you passed out fliers once a week on Tuesdays.
A. But earlier Your Honor did not ask me whether or not I passed out fliers on any other day.
Q. No, I asked you when did you pass out fliers.
A. I say usually on Tuesday.
Q. Well, we could go back and listen, but you didn’t say usually. You said Tuesdays.... And the record will speak for itself. You did not say usually Tuesday. You said Tuesday. So I’ll give you one more opportunity to explain why you’re now passing them out on Fridays. And you didn’t volunteer that day of the week earlier.
A. (No audible response.)
Q. Okay. Non-responsive. No response, so she doesn’t know.
(A.92-93.) Thus, the IJ mischaracterized Lin’s testimony in two respects — that Lin handed out literature “only” once per week, and that she did so only on Tuesdays, though Lin answered “Tuesday” in response to the IJ’s own question about which day of the week she “usually” did so. Then, after Lin gave that explanation, the IJ incorrectly rejected it and faulted Lin’s silence in the face of the IJ’s demand that she provide a different one. Finally, when counsel tried to clarify the issue by asking Lin additional questions, the IJ cut him off: “We’ve already gone through that, okay? So why are you asking her now? She says Friday now. I asked her why she didn’t volunteer that earlier, no response. So give it up. Let’s move on.” (A.94.) Thus, this perceived inconsistency is not based on the record, and the IJ erred in relying on it.
Second, the IJ relied on the Western calendar to find that the day Lin claims her parents were arrested, November 13, 2005, was a Sunday instead of a Friday as Lin had testified. The IJ raised this issue sua sponte in between direct and cross-examination in a way that seems more adversarial than impartial. The IJ began by asking Lin a series of questions designed to get her to commit to her prior testimony that her parents were arrested on a Friday, then sprang on her the fact that the Western calendar shows that it is a Sunday. (A.101-05.) Along the way, perhaps rattled by the exchanges discussed above, Lin first agreed that the date had been a Friday but then testified “[ajctual *792 ly, I’m not sure what day was that day.” (A.102.) The IJ then established that the day had been a school day, and that Lin went to school only on Monday through Friday and sometimes Saturday. (Id.) The IJ concluded her line of questioning by saying: “Well, let me just, all this has been to show that November 13th, 2005, was on a Sunday. All right? Here’s the calendar. We’ll put it in the record.” (A.104.) When the IJ asked Lin to explain, she testified that “[t]he Chinese calendar is different than the Western calendar.” (Id.) The IJ asked Lin if she had a Chinese calendar for the record. Lin did not, and the IJ did not inquire further. In her decision, the IJ took administrative notice that the date in question was a Sunday and stated that Lin’s explanation regarding the Chinese calendar was “totally unsubstantiated by any proof.” (IJ Dec. at 12, A.58.)
The IJ erred in rejecting Lin’s explanation solely because she did not corroborate it. Lin had no reason to expect that the IJ might sm sponle raise an issue regarding a day of the week that might require consultation of a Chinese calendar, and the IJ did not address whether it was reasonable to expect such corroboration. See Chukwu, 484 F.3d at 191-92. Even if it was, the IJ’s duty to develop the record required her to allow Lin to obtain a calendar or at least inquire further before basing her denial of relief on this issue. See id. at 192.'[4]
Third, the IJ relied on a prior immigration interview, during which Lin apparently said that her parents practiced Falun Gong but not that she did too. The IJ and the parties have referred to this interview alternately as an “airport interview,” a “detention interview,” a “credible fear interview,” and finally, in the Government’s brief in this Court, as Lin’s “initial immigration interview.” The record does not contain a transcript or other documentation of the interview itself, and the only record references to this interview are the Government counsel’s characterization of its contents. (A.105-06.) Lin does not dispute those characterizations, but the IJ erred in relying on them.
The IJ’s reliance on the interview is problematic initially because there is no documentation of the interview in the record. “To determine whether [a discrepancy with an airport interview] constitutes substantial evidence to support the IJ’s and BIA’s adverse credibility determinations, it is necessary to examine the circumstances in which the statement was given.” Fiadjoe, 411 F.3d at 159. Thus, “[w]e repeatedly have emphasized that we are ‘generally skeptical’ of using reports of asylum interviews as the basis for finding an applicant lacks credibility where the context for such interviews is unclear.” Korytnyuk v. Ashcroft, 396 F.3d 272, 289 (3d Cir.2005). In this case, we do not even have a report. See id. at 289-90 (refusing to uphold adverse credibility determination based on interview whose contents were not of record).
Moreover, the IJ’s refusal to accept Lin’s explanation for this apparent dis *793 crepancy is problematic as well. When confronted with the discrepancy on cross-examination, Lin explained, in response to several questions: “I was scared at that time. I dare not tell them I was practicing Falun Gong.... [A]t that time I was scared to seeing strangers.... I was afraid that he will send me back.” (A.106-07.) The IJ found this explanation “incredulous [sic]” because, according to the IJ, Lin “acknowledged her activity with Falun Gong in passing out fliers.” (IJ Dec. at 12, A.58.)[5] The IJ also found that Lin’s explanation “defied credibility because the very reason respondent came to the United States was to freely practice Falun Gong,” and her fear of telling the Immigration officer that she had practiced in China was “inconceivable.” (Id.) As we have repeatedly recognized, however, “an arriving alien ... may be reluctant to reveal full information in his or her first meeting with the government.” Fiadjoe, 411 F.3d at 159. Thus, there is nothing “inconceivable” about Lin’s reluctance to tell the interviewer more than she did, whatever that may have been.
Fourth, the IJ noted that the corroborating letter from Lin’s mother did not mention that Lin spent four months in hiding at her aunt’s house, and concluded that the omission “contradicts” Lin’s testimony that she did so. The letter from Lin’s mother, however, corroborates Lin’s practice of Falun Gong and her parents’ arrest, and goes on to state that “[a]fter I was released, I knew my daughter was hiding outside. She dared not go back. I decided to send my daughter abroad.” (A.115.) This letter does not “contradict” Lin’s testimony merely because it does not contain the same level of detail. Moreover, Lin explained that her mother may have thought that detail unimportant because her aunt’s house was very far away. (A.95-96.) The IJ did not acknowledge that explanation or discuss why she found it unacceptable. See Chukwu, 484 F.3d at 192.
Fifth, the IJ noted that Lin had not provided any corroboration from her aunt. When asked why, Lin testified that her aunt had a stroke shortly after Lin came to the United States and could neither speak nor write. (A.94.) The IJ stated that “[t]he Court finds that this was just a convenient excuse.” (IJ Dec. at 13, A.59.) There is no record support for this insensitively-phrased “finding.” The IJ went on to state that, assuming Lin’s explanation were true, then it would provide all the more reason to expect her mother’s letter to mention the aunt’s role in hiding Lin. As explained above, however, the IJ did not discuss why she found Lin’s explanation regarding her mother’s letter unacceptable.
Finally, the IJ found that Lin “was not believable when she explained why there was no one to corroborate her practice [of Falun Gong] in the United States.” (Id.)[6] The IJ’s two reasons for rejecting Lin’s *794 explanation are based on speculation, not on the record. Lin testified that she practices Falun Gong at her home, which she shares with one other person, and that her house mate had never witnessed her practice Falun Gong. (A.97.) The IJ apparently found that circumstance unbelievable, but the record contains no basis to conclude that Lin’s house mate necessarily would have seen her practicing Falun Gong. The IJ apparently found unbelievable Lin’s testimony that she did not know her house mate’s name as well, though the IJ did not mention Lin’s testimony that she knows him by his surname “Li.” (A.97.)
Lin also testified about a friend of hers who had helped her find the house, and testified that she had not mentioned her practice of Falun Gong to that friend because she considered it a “private issue” and “didn’t want to bother (indiscernible).” (A.99-100.) She further testified that she felt a “shadow in [her] mind” regarding Falun Gong in light of what happened to her in China. (A.100.) The IJ found this testimony “inexplicable” because Lin had practiced openly in China even though it was illegal, came to this country to practice openly, and it was thus “not understandable why she would hide her practice of Falun Gong from such a friend.” (IJ Dec. at 13-14, A.59-60.) This conclusion mischaracterizes Lin’s testimony. She did not say that she “hid” her practice from her friend, only that she did not share it because she considered it a “private issue.” This conclusion also is based on speculation about the nature of the friendship.
In sum, each of the grounds on which the IJ denied Lin’s claims either lacks record support or is otherwise problematic. The BIA did not state any independent basis for denying Lin’s claims. Instead, it merely noted the provisions of the REAL ID Act governing credibility and corroboration and concluded that the IJ’s adverse credibility finding “is sufficiently supported by the record.” Though our review is deferential, we are constrained to disagree. We do not suggest that Lin in fact has shown that she is eligible for asylum or entitled to withholding of removal or other relief under CAT. Instead, we conclude only that the grounds on which the IJ and BIA denied her claims are not supportable. Accordingly, we will vacate the BIA’s order of removal and remand for further proceedings.

. Lin also claimed that she feared mistreatment for having left China illegally, but she has not addressed that claim in her brief, so it is waived. See Alaka v. Att'y Gen., 456 F.3d 88, 94 (3d Cir.2006).

. The provisions of the REAL ID Act regarding credibility determinations and corroboration apply here, the former because Lin filed her asylum application after May 11, 2005, see Chulavu, 484 F.3d at 189, and the latter because they were effective immediately upon enactment, see id. at 191. They do not, however, control our disposition, which does not turn on whether the inconsistencies on which the IJ relied “go to the heart of the applicant’s claim,” id. at 189; 8 U.S.C. § 1158(b)(l)(B)(iii), or on any conclusion regarding the availability of corroborating evidence, see Chukwu, 484 F.3d at 191 & n. 2; 8 U.S.C. § 1252(b)(4). “[T]he REAL ID Act does not change our rules regarding the IJ’s duty to develop the applicant's testimony!.]” Chukwu, 484 F.3d at 192.

. In addition to raising argument addressed to these six grounds, Lin includes cursory arguments on the issue of past persecution and the merits of her CAT claim. These issues are not adequately argued for purposes of review, but, because neither the IJ nor the BIA addressed the merits of these claims, Lin is free to argue them on remand.

. The Government argues that Lin's counsel, despite raising this argument on review, "conceded” at the hearing that Lin's explanation regarding the Chinese calendar was "false.” After Lin testified that ”[t]he Chinese calendar is different than the Western calendar,” the IJ asked Lin's counsel, “Is that right, days of the week are different?” and he replied “I don't think so.” (A.104-05.) Counsel’s statement was not an affirmative concession and was not evidence, as the IJ acknowledged by going on to ask Lin if she had a Chinese calendar for the record. (A. 105.) We, of course, express no opinion on this issue in the first instance. We also express no opinion on whether, if Lin’s explanation ultimately is shown to be inaccurate, that discrepancy by itself would warrant the denial of her claims.

. There is no record support for that conclusion. The only reference in the record to Lin having told the interviewer that she handed out Falun Gong literature is this statement by the Government's counsel, which Lin did not adopt:
Q. You weren't scared to tell the officer that you helped your parents out by passing out pamphlets, but you were scared to tell the officer that you practiced Falun Gong, is that what you’re saying?
A. I was afraid that he will send me back.
(A. 107.)

. Although we assume that Lin's practice of Falun Gong in the United States might have some relevance to her claims, we note, and the BIA should bear in mind on remand, that her claim is based on her practice of Falun Gong in China and on Chinese authorities’ efforts to arrest her on that basis.