

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-19-2006

# Gabuniya v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-3339

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Gabuniya v. Atty Gen USA" (2006). *2006 Decisions*. Paper 392.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/392

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3339

———

ZAZA GABUNIYA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

———

On Petition for Review of an Order
of the Board of Immigration Appeals
(BIA No. A95-462-488)
Immigration Judge: Donald V. Ferlise

———

Argued June 8, 2006
Before: AMBRO, FUENTES, and NYGAARD, Circuit Judges.

(Filed September 19, 2006)


Christina L. Harding (Argued)
Tatiana Aristova
Law Office of John J. Gallagher, P.C.
1760 Market Street, Suite 1100
Philadelphia, PA 19103

1

ATTORNEY FOR PETITIONER

Peter D. Keisler
Theresa M. Majkrzak (Argued)
United States Department of Justice
55 Erieview Plaza, Suite 700
Cleveland, OH 44144

Christopher C. Fuller
William C. Peachey
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

ATTORNEYS FOR RESPONDENT

———

OPINION OF THE COURT

———

FUENTES, Circuit Judge.

Zaza Gabuniya, a native and citizen of the country of Georgia, entered the United States in 2001, and subsequently applied for asylum, withholding of removal, and protection under the Convention Against Torture. In support of his application, Gabuniya alleged that as a result of his support for democratic reforms in Georgia he was threatened, arrested, and beaten on numerous occasions, and that his wife was killed by government officials. The Immigration Judge ("IJ") ruled that: 1) Gabuniya was not credible; 2) even if credible, his allegations did not demonstrate past persecution or torture; 3) and, in any event, conditions in Georgia had changed since Gabuniya's departure such that he was not likely to face persecution or torture upon his return.

2

We find that substantial evidence does not support the IJ's finding that Gabuniya lacked credibility. We also find that substantial evidence does not support the IJ's finding that, even if credible, Gabuniya's allegations did not demonstrate evidence of past persecution. In addition, because the BIA did not rule on the IJ's conclusion that country conditions in Georgia have changed, we grant the petition for review and remand the case to the BIA.

## I. Factual and Procedural Background

This immigration appeal concerns the oppressive tactics of Georgian police officials under the Shevardnadze regime, which governed Georgia after its independence from the Soviet Union and subsequent civil war. Georgia became an independent state on April 9, 1991 and, shortly thereafter, Zviad Gamsakhurdia was elected its first president. Petitioner Zaza Gabuniya ("Gabuniya") supported Gamsakhurdia, who began to carry out democratic reforms immediately after taking office. However, in December 1991, Gamsakhurdia was overthrown in a bloody coup d'etat, and the country entered into a civil war. In 1992, Eduard Shevardnadze, a Georgian who had been involved in Soviet politics, joined the leaders of the coup and was soon appointed the interim chairman of the Georgian state council. When the civil war ended in 1995, Shevardnadze was elected president of Georgia.

Gabuniya did not participate in the hostilities during the civil war, but he provided food and water to supporters of Gamsakhurdia when they were in his village. In 1994, Gabuniya and his wife joined a local group formed in opposition to the Shevardnadze regime. The group, which had no formal name, was formed by Dato Datiashvili, a supporter of Gamsakhurdia who had fought in the civil war, and eventually grew to about 200 members. The group met in Datiashvili's house, where members would plan demonstrations and the distribution of leaflets. Gabuniya participated in two or three demonstrations before August of 1995.

3

Civil unrest continued throughout Shevardnadze's time as president, and opponents of the Shevardnadze regime were specifically targeted by the government. On August 29, 1995, there was an assassination attempt on Shevardnadze's life, followed by government reprisals. Datiashvili was arrested and never seen or heard from again. Datiashvili's anti-Shevardnadze group ceased activities from August 1995 to January 1996 out of fear of persecution. In January 1996, the group resumed its activities, this time with Murtaz Dzavakhia as its new leader. Gabuniya and his wife again became active members. Though the group opposed the assassination attempt and ended their support for followers of Gamsakhurdia, it continued to support democratic reforms and to oppose the Shevardnadze regime. The group engaged in peaceful protests and distributed leaflets advocating that the Georgian people more actively defend their democratic rights.

According to Gabuniya, a few months after the group resumed activities Georgian police descended upon a peaceful demonstration with rubber clubs and tear gas. Gabuniya was struck on the shoulder, forced into a police bus, and taken to the police station. At the station, he was interrogated and told that he must cease holding "anti-governmental meetings of this kind" or else face severe consequences. Gabuniya nonetheless continued to engage in activities with the group after his arrest, distributing leaflets and approaching people to encourage dialogue about democratic reform.

One year later, Gabuniya and his wife took part in a large demonstration that the police violently dispersed using rubber clubs and fire hoses.[1] Gabuniya and his wife were detained and taken to the police station, where Gabuniya was brought to a small room and beaten by two policemen. Three hours later, he was interrogated about his activities with the group and the group's objectives and membership. Gabuniya's inability to provide more than a few names angered the officer interrogating him, and the officer told him that he would be put on a list of

---

[1] Gabuniya alleges that there were approximately 5000 participants in the demonstration.

politically unreliable persons and enemies of Georgia. After two hours, he was beaten again. The next day Gabuniya was brought before the officer who had previously interrogated him and who now told him that, although he would be released, he would be in "big trouble" if he did not stop his activities with the group. Gabuniya was released and found his wife, who had been interrogated but not beaten. The next month, Gabuniya and his wife began receiving threatening phone calls. The callers used obscene language and demanded that Gabuniya and his wife stop their activities or they would be sorry.

On February 9, 1998, about nine months after Gabuniya's second arrest, there was a second assassination attempt on Shevardnadze. Six days later, two State Security Services ("SSS") agents came to Gabuniya's home and took Gabuniya to an SSS headquarters in Kutaisi. There, a man who identified himself as Koba Darsavelidze questioned Gabuniya and accused him of having links with those who planned the assassination attempt. Darsavelidze waived documents in front of Gabuniya that he claimed provided proof of Dzavakhia's involvement in the assassination attempt. Darsavelidze demanded Gabuniya confess and sign a statement that Gabuniya was not permitted to read. Gabuniya refused and insisted he had done nothing illegal. He was taken into a separate room and beaten by two men. He was again asked to sign the statement and again refused. The SSS agents told Gabuniya that sooner or later he would be forced to sign a statement and that, if he did not do so voluntarily, he would be implicated in the assassination attempt. The agents released Gabuniya after seven hours in the SSS office. For months after the incident, Gabuniya received threatening phone calls telling him that he would have to "comply with the request to make a certain statement."

Six months later, Gabuniya and his wife were leaving a friend's home when four men approached them. Gabuniya recognized one of them as a man who had beaten him at the SSS office. One of the men chastised Gabuniya for continuing his "anti-government activities" despite the warning and "forgetting" to sign a statement, and told Gabuniya that they would "refresh his memory." The men began to beat him. When his wife cried for help, she was beaten as well. She fell

5

and hit her head on the curb, losing consciousness. Soon thereafter, the attackers fled as other people approached the scene. As they left, Gabuniya's attackers threatened to kill him when they saw him next. Gabuniya and his wife were taken to a hospital, where he was treated for an injury to his elbow. His wife, who suffered a skull fracture as a result of the attack, never regained consciousness and died a few days later.

Gabuniya fled the area, first traveling to Mestia, approximately 25 miles from his home town of Geguti. In the summer of 1999, he arranged to get a passport without appearing in person at the appropriate Georgian office. After obtaining a passport, he applied for a visa to travel to the United States, but was denied. He then traveled to the Ukraine, where he arranged to obtain an illegal passport and visa to travel to Mexico. In February of 2000, Gabuniya traveled to Mexico by way of Turkey, and remained there for almost a year. While working in Mexico, he contacted Eka Barbakadze, a friend from Georgia who was living in the United States. With Barbakadze's assistance, Gabuniya was able to raise sufficient funds to pay a guide to help him cross the United States border.

Gabuniya entered the United States illegally on January 27, 2001. He reached Philadelphia, where Barbakadze was living, on February 10, 2001. While in Philadelphia, Gabuniya continued to contact his friends and family in Georgia. His parents informed him that they had received threatening phone calls inquiring about Gabuniya's whereabouts. Vitaly Siradze, a member of the group to which Gabuniya belonged in Georgia, informed Gabuniya that he had also received threatening phone calls claiming that Gabuniya was a suspect wanted by the authorities and demanding to know Gabuniya's whereabouts. As a result of these threats, Siradze went into hiding. Gabuniya also learned that other group members had disappeared under mysterious circumstances and, as a result, the group had ceased to operate.

On May 3, 2002, Gabuniya applied for asylum, withholding of removal, and protection under the Convention Against Torture (the "CAT"). After an asylum officer denied

the application, the INS issued a Notice to Appear charging him with removability and placed Gabuniya in removal proceedings. In a hearing before Judge Donald V. Ferlise, the Immigration Judge ("IJ"), Gabuniya conceded removability, and indicated his intent to seek asylum, withholding of removal, and protection under the CAT. After holding a merits hearing, the IJ denied the application on December 3, 2003, finding that Gabuniya had embellished his testimony and was not credible. The IJ also found that, even if Gabuniya were credible, the events that Gabuniya alleged took place in Georgia did not amount to persecution or torture. In addition, the IJ found that, even if past persecution had been established, the change in country conditions rebutted any presumption that Gabuniya would be persecuted or tortured if he returned to Georgia. Gabuniya timely appealed the IJ's decision to the Board of Immigration Appeals ("BIA") in January 2004.

While Gabuniya's appeal was pending before the BIA, he won the Diversity Immigrant Visa[2] lottery, which required him to file an application to adjust his status.[3] In July of 2004, seven months after filing his appeal from the IJ's decision, Gabuniya moved for a remand so that he could adjust his status. Two months later, he married Barbakadze. Barbakadze, though not a United States citizen, was the beneficiary of an approved I-130 application filed by her previous husband during their marriage. In September 2004, Gabuniya submitted an amended I-485 application for asylum, attaching a copy of Barbakadze's

---

[2] The Diversity Immigrant Visa Program makes available annually 50,000 permanent resident visas to randomly selected persons who meet strict eligibility requirements and are from countries with low rates of immigration to the United States. See http://travel.state.gov/visa/immigrants/types/types_1322.html.

[3] Contrary to Gabuniya's assertion that he won the Diversity Visa lottery while his appeal before the BIA was pending, the Government alleges that Gabuniya won the Diversity Visa lottery in May 2003, before the Immigration Judge issued his decision. We need not resolve this discrepancy because the timing of this event has no bearing on our decision.

approved I-130, but no evidence that she obtained a visa or adjusted her status.

On June 10, 2005, the BIA affirmed the IJ's denial of Gabuniya's application for asylum, withholding of removal, and protection under the CAT, finding that the IJ correctly ruled that Gabuniya was not credible and failed to meet his burden of proof. The BIA also denied the motion for a remand as being without merit, but provided no further explanation.

## II. Analysis

### A. Applicable law

The Attorney General may "not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[4] 8 U.S.C. § 1231. In order to be eligible for withholding of removal, Gabuniya must demonstrate a clear probability of persecution–in other words, that it is more likely than not that he will be persecuted if he returns to Georgia. See Toure v. Attorney Gen., 443 F.3d 310, 317 (3d Cir. 2006). Similarly, to qualify for relief under the

---

[4] We consider only Gabuniya's petitions for withholding of removal and protection under the CAT because we lack the jurisdiction to review his petition for asylum. It is undisputed that Gabuniya failed to file an application for asylum within one year of his entry to the United States. The IJ denied his application on the ground that, absent extraordinary circumstances, an alien may not apply for asylum after he has been in the country for more than one year. 8 U.S.C. § 1158(a)(2)(B), (D). Because we lack jurisdiction "to review an IJ's determination that an asylum petition was not filed within the one year limitations period, and that such period was not tolled by extraordinary circumstances," we must deny Gabuniya's petition for review of the BIA's denial of his asylum claim. Tarrawally v. Ashcroft, 338 F.3d 180, 185 (3d Cir. 2003); see 8 U.S.C. § 1158(a)(3).

CAT, Gabuniya must demonstrate that it is more likely than not that he will be tortured if he is removed to Georgia. 8 C.F.R. § 208.16(c)(2) (2006); Toure, 443 F.3d at 317.

Gabuniya argues that he is entitled to withholding of removal and protection under the CAT because of the persecution he faced at the hands of the Georgian government. An applicant who establishes past persecution is entitled to a presumption that his life or freedom will be threatened if he returns. See 8 C.F.R. § 208.16(b)(1). We have defined persecution as "'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" Li v. Attorney Gen., 400 F.3d 157, 167 (3d Cir. 2005) (citation omitted). Similarly, evidence that the applicant has been tortured in the past is to be considered in an application for protection under the CAT. 8 C.F.R. § 208.16(c)(3)(i). Torture is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (2006). The testimony of the applicant alone, if credible, may be sufficient to sustain the applicant's burden of proof for demonstrating past persecution and torture. 8 C.F.R. § 208.16(b), (c)(2).

## B. The adverse credibility finding

The IJ found that Gabuniya's claims of past persecution

9

were not credible.[5]  We review adverse credibility determinations under the substantial evidence standard.  See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).  We cannot overturn a credibility finding simply because we would reach a different opinion; rather, we must find that "any reasonable adjudicator would be compelled to conclude the contrary." Shadar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B).  Although our review of a credibility finding is generally deferential, "that deference is expressly conditioned on support in the record, and deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) (internal citations and quotation marks omitted); see also Caushi v. Attorney Gen., 436 F.3d 220, 226 (3d Cir. 2006).

In making an adverse credibility determination, the IJ must provide "'specific, cogent reason[s]'" why the applicant is not credible.  Gao, 299 F.3d at 275-76 (citation omitted).  Minor discrepancies that do not go to "'the heart of the . . . claim'" do not merit an adverse credibility finding.  Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004) (citation omitted).  The IJ's conclusions must "'flow in a reasoned way from the evidence of record'" and cannot be "'arbitrary and conjectural in nature.'" Caushi, 436 F.3d at 226 (quoting Dia, 353 F.3d at 250).

The IJ based his adverse credibility determination on inconsistencies in Gabuniya's testimony with respect to the date of his wife's death, the date of his third arrest, and his description of the injury he suffered when the police assaulted him and his wife.  The IJ also appears simply to have not believed Gabuniya's account of his third arrest.  We address these bases for the IJ's credibility determination in turn.

As the IJ noted, although Gabuniya initially testified that

---

[5] Because the BIA adopted the opinion of the IJ with respect to the IJ's credibility determination, we review the IJ's opinion.  See Wang v. Attorney Gen., 423 F.3d 260, 267 (3d Cir. 2005).

10

his wife died immediately after being beaten by the police on August 5, 1998, he later stated that she died three days later. Gabuniya explained that, in his initial testimony, he had been trying to emphasize the fact that the injury she sustained on August 5, 1998, was the direct cause of her death. Gabuniya's testimony is supported by his wife's certificate of death stating the correct date of her death and the reason for her death as "Hard trauma of skull-brain, beating of sinciput on the left, beating of forehead on the left."

The IJ's credibility finding on this issue was not supported by substantial evidence, given that, on August 5th, Gabuniya's wife sustained a fatal blow that rendered her in an unconscious state from which she never recovered. More important, however, is the fact that the alleged inconsistency has nothing to do with whether or how Gabuniya's wife actually died; notably, the IJ did not express any doubt that she was killed by the police.[6] The inconsistency only calls into doubt the date on which she died. We have stated that "minor inconsistencies and minor admissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding. [Rather, t]he discrepancies must involve the heart of the asylum claim." Berishaj, 378 F.3d at 323 (internal citations and quotation marks omitted).[7] We fail to see how inconsistency regarding the date

---

[6] In fact, the IJ apparently did not believe that this inconsistency revealed any specific lie or exaggeration on Gabuniya's part. The IJ only stated that the inconsistency negatively affected Gabuniya's credibility in general. We have found no support for such a broad and vague mode of impeaching the credibility of an applicant for asylum, withholding of removal, or protection under the CAT.

[7] The Real ID Act of 2005 changes the standards governing credibility determinations, stating that those determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (to be codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). This

of his wife's death goes to the heart of Gabuniya's claim that he was persecuted in Georgia.

The IJ next pointed out that Gabuniya incorrectly stated that his third arrest took place on February 9, 1998, when the police came to his home after an assassination attempt on Shevardnadze. Without being confronted with his error, Gabuniya stopped to clarify that he had mistakenly provided the date of the assassination attempt as the date of his arrest, and that he was not arrested until a few days later, on February 15, 1998. Based on this testimony, the IJ concluded that Gabuniya "impeach[ed] . . . [his] own testimony within a rather short period of time," which "negatively impacted [his] own credibility." To the contrary, the fact that Gabuniya, without being told of his error, took the initiative to correct himself and clarify his testimony bolsters rather than undermines his credibility. Furthermore, Gabuniya's explanation for his error is reasonable because there is a causal link between the date of the assassination and his subsequent arrest. Moreover, Gabuniya's inconsistency with respect to the date of his arrest does not go to the heart of his claim, particularly where it is followed immediately by a reasonable explanation. See Gao, 299 F.3d at 273.

The IJ also noted Gabuniya's testimony that he injured his hand when the police assaulted him and his wife. When asked why his asylum application stated that his elbow had been injured, Gabuniya explained that he had used the Georgian word for "arm," which is also the Georgian word for "hand," and that his testimony was translated as "hand" when it could also have been translated as "arm," encompassing the elbow. The IJ asked the translator if there was a separate word for "hand" and "elbow," and the translator responded that there was. However, the IJ did not inquire into whether the word "hand" could also be

_____

provision, however, only applies to aliens who applied for asylum, withholding of removal, or other relief after May 11, 2005, the effective date of the Act. See id. § 101(h)(2), 119 Stat. at 305. As Gubuniya applied for relief from removal in 2002, this provision does not apply to our review of his claims.

12

translated as "arm,"and thus did not explore Gabuniya's explanation. (Id.) Regardless, even if this inconsistency could not be explained by a translation error, it does not support an adverse credibility finding given Gabuniya's otherwise detailed, consistent, and logical testimony. Cf. Gui Cun Liu v. Ashcroft, 372 F.3d 529, 534 (3d Cir. 2004) (remanding because "[a]bsent the one glaring inconsistency," evidence was insufficient to support adverse credibility determination).

The IJ also appears to have simply not believed Gabuniya's account of his third arrest. Specifically, the IJ expressed doubt that government agents would hold Gabuniya for only seven or eight hours if they intended to coerce him to admit involvement in the assassination attempt on Shevardnadze. The IJ cited no facts or evidence to support this conclusion, stating only that it was based on "the considered opinion of the court." As we have stated, "[a]dverse credibility findings based on speculation or conjecture, rather than on evidence in the record, are reversible." Gao, 299 F.3d at 272. The IJ's opinion regarding how long Georgian police would have held Gabuniya was purely speculative and was not a proper basis for an adverse credibility determination. See Jishiashvili v. Attorney Gen., 402 F.3d 386, 393-94 (3d Cir. 2005) (stating that IJ's conclusions about "implausibility" of petitioner's testimony about police interrogations in Georgia had to be "properly grounded in the record and, to that extent, informed by the conditions in the petitioner's country") (internal quotation marks and citations omitted).

We note with concern the IJ's dogged determination to make an adverse credibility finding by stringing together whatever insignificant inconsistencies he could unearth from the testimony and bolstering them with his own unsupported conjecture. While we appreciate the difficulty an IJ must face in vetting applications for asylum, withholding of removal, and protection under the CAT, this responsibility is not license to jump eagerly on each slip of the tongue or to demand that an applicant be infallible in order to be credible. Here, it is plain that "no reasonable fact finder could reach the same conclusion" reached by Judge Ferlise. Chavarria v. Gonzalez, 446 F.3d 508, 517 (3d Cir. 2006). We therefore conclude that the IJ's adverse

13

credibility determination was not supported by substantial evidence.

While the IJ's credibility determination focused on irrelevant inconsistencies, his determination that Gabuniya's testimony, if credible, did not establish past persecution ignored the wealth of detailed, logical, and consistent testimony demonstrating that Gabuniya suffered significant abuse at the hands of the Georgian authorities. Gabuniya testified that he endured arbitrary arrest, detention, beatings, threats, coercive attempts to extract a false confession, and the murder of his wife. We cannot agree with the IJ's glib characterization of these incidents as merely "the denial of the right of free speech and the right to demonstrate." A reasonable factfinder would be compelled to conclude that these incidents fall within the definitions of persecution and torture and that Gabuniya met his burden of demonstrating that it is more likely than not that he will face persecution or torture if he returns to Georgia. See Voci v. Gonzales, 409 F.3d 607, 614 (3d Cir. 2005) (holding that "multiple beatings from police, including beatings that caused injury . . . all as a result of [the petitioner's] political beliefs" constituted persecution). We therefore find that substantial evidence does not support the BIA's holding that (i) Gabuniya was not credible and (ii) did not establish a clear probability of future persecution and torture based on past incidents of persecution and torture.

## C. Changed country conditions

The IJ found that, even if Gabuniya had demonstrated past persecution, conditions in Georgia had changed such that he was no longer more likely than not to be persecuted if he returned there. When an applicant establishes a presumption of future persecution based on evidence of past persecution, the Government may rebut the presumption by demonstrating by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened . . . upon the applicant's removal." 8 C.F.R. § 208.16(b)(1)(i)(A), (b)(1)(ii).

A mere ten days before the IJ's decision in this case,

14

Shevardnadze resigned in a bloodless change of regime known as the "Rose Revolution." Based solely on this fact, and without any evidence in the record of changed conditions regarding the practice of arbitrary arrest, torture, or corruption, or any evidence that conditions had changed for those advocating democratic reform, the IJ concluded that Gabuniya no longer faced any threat of future persecution by the Georgian government due to his political activities. The IJ then ordered Gabuniya removed to Georgia on or before January 2, 2004–before the scheduled elections in Georgia and prior to any democratic reforms.

In its order affirming the IJ's order of removal, the BIA explicitly stated its agreement only with the IJ's credibility finding and the IJ's finding that Gabuniya had not met his burden of proof. The BIA did not, however, consider the IJ's finding of changed country conditions. The BIA then stated that, "[i]nasmuch as we are in agreement with the decision of the Immigration Judge as noted above, we adopt and affirm his decision." (Id. (emphasis added).) Because the BIA did not consider or adopt the IJ's finding of changed country conditions, we must remand this issue to the BIA.[8] See Immigration and

_____

[8] We also remand because the BIA failed to provide any explanation for its denial of Gabuniya's motion to remand. We review the BIA's denial of a motion for abuse of discretion. McAllister v. Attorney Gen., 444 F.3d 178, 185 & n.7, 190-91 (3d Cir. 2006). To ascertain whether the BIA abused its discretion, we must determine whether it "followed proper procedures and considered the material evidence before it." Korytnyuk v. Ashcroft, 396 F.3d 272, 293 (3d Cir. 2005) (quotation marks and citation omitted). Here, there is no indication that the BIA considered any of the evidence or arguments concerning Gabuniya's motion to remand. Where the BIA provides no explanation for its denial of a motion, "[w]e are not at liberty to search the law and the record for reasoning to support the BIA's decision." See Mickeviciute v. Immigration and Naturalization Serv., 327 F.3d 1159, 1162-63 (10th Cir. 2003). We therefore remand the issue to the BIA for further consideration.

15

Naturalization Serv. v. Ventura, 537 U.S. 12, 13-14, 16-17 (2002) (per curiam); Wang, 423 F.3d at 267 (noting that we review only BIA decisions, except under limited circumstances where BIA defers to or adopts IJ's opinion); Gao, 299 F.3d at 271 (same).

## III. Conclusion

For the aforementioned reasons, we conclude that the IJ's adverse credibility determination, and the IJ's determination that, if credible, Gabuniya's testimony did not establish past persecution, are not supported by substantial evidence. Accordingly, we grant the petition for review. Because the BIA has not yet considered the IJ's conclusion that country conditions had changed, we remand this case to the BIA for further proceedings consistent with this opinion as to Gabuniya's claim for withholding of removal and protection under the CAT.