**DE JI, Petitioner**

v.

**The ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–4863.

United States Court of Appeals, Third Circuit.

Argued May 27, 2010.

Filed: June 25, 2010.

Gary J. Yerman, Esq., [Argued] Yerman & Associates, New York, NY, for Petitioner.

Zoe J. Heller, Esq., Thomas W. Hussey, Esq., Nairi M. Simonian, Esq., [Argued] U.S. Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC, for Respondent.

Before: McKEE, Chief Judge, RENDELL and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Petitioner De Ji[1] seeks review of an order of the Board of Immigration Appeals ("BIA") which affirmed the decision of the Immigration Judge ("IJ") denying Petitioner's applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The BIA based its decision on the IJ's decision, which in turn rested entirely and explicitly on the IJ's adverse credibility determination. We find that the IJ's adverse credibility determination was not supported by substantial evidence. In particular, we find that the IJ did not appropriately take into account record evidence that explained the one discrepancy upon which the adverse credibility determination rested, and that the Petitioner's supposed "unresponsiveness" and "evasiveness" in answering questions is not enough to sustain an adverse credibility determination on this record. We will therefore grant review, vacate, and remand for further proceedings consistent with this opinion.

---

1. It is unclear what exactly constitutes her name and surname, but she is referred to in the briefs as "Ms. De Ji," though the non- phonetic spelling of her full name appears to be "Dekyi Dolma." App. 143.

## I.

Ji is a native of Tibet and a citizen of the People's Republic of China.[2] She was born in Lhasa, Tibet, where she was educated and eventually obtained a position teaching the Tibetan language at an elementary school. Her father was a member of the Chushi Gangdruck, a Tibetan guerilla movement, and was imprisoned for over fifteen years for his involvement with this group. Her uncle was also active in the guerilla movement, and fled into exile. In her statement in support of her asylum application, Ji notes that her family is monitored by the Chinese Government more closely than most because of this family history, since from the Chinese Government's perspective, she comes from a "bad family background." App. 139–40.

Concerned about the lack of opportunities for people with a family background like hers, Ji decided to study English in America for a year, since knowledge of the English language was valuable in Tibet. Ji received a scholarship from the Tibet Fund in New York City, which offers scholarships to Tibetans wishing to learn English. Ji entered into the United States in 2004 on a J–1 visa to study English at the College of Southern Idaho.

Toward the end of her year-long stay in the United States, Ji learned that the Dalai Lama would be visiting Columbia University in New York. In her statement, she mentioned that "the Chinese Government refuses to allow the Dalai Lama to visit his people in Tibet" and so "Tibetans who leave their homeland for any length of time eagerly seek opportunities to visit him." App. 142. Ji traveled to New York, and on September 27, 2005, had an opportunity to meet with the Dalai Lama privately in a small group. Ji states that she

reported to him regarding the state of education in Tibet. At this meeting with the Dalai Lama, a photograph was taken of Ji with the Dalai Lama. This photograph is clearly of her with the Dalai Lama and is part of the record.

At this point in the narrative, some of the facts are in dispute, and the IJ's adverse credibility determination was based largely on what the IJ took to be discrepancies regarding these following facts as found in Ji's application for asylum submitted on March 12, 2006 and the facts that Ji testified to at her merits hearing on April 20, 2007.

The basic story of what happened next, according to Ji, is that Ji sent the photograph, as part of a larger package, to her parents in Tibet in October of 2005. Her parents were not home when the photograph arrived, and so the package was eventually brought to local officials who opened the package. The officials saw the photograph of Ji with the Dalai Lama, submitted it to Chinese Government authorities, and this led to government officials visiting her parents and interrogating her parents regarding her whereabouts and activities. Her parents then sent a letter to Ji, telling her of what had happened, and urging her not to return for fear that she would be harmed and/or imprisoned by Chinese Government officials. It was at this point that Ji submitted her application for asylum, withholding of removal, and protection under the CAT.

The IJ found that there were three critical facts in the case: (1) that there was a photograph with Ji and the Dalai Lama together, (2) that the photograph made its way to Tibet, and (3) that the Chinese authorities now are interested in Ji, because of the photograph. The IJ did not

---

**2.** The People's Republic of China has asserted and maintained control over Tibet since 1950, although this control has been contested for much of that time.

question that there was a photograph with Ji and the Dalai Lama, but noted that

> The problem I have with [Ji's] credibility is whether she has been persuasive as to whether these photos have gone to China or to Tibet, and have been discovered by the authorities, and therefore, would give rise to problems for her, because of that. My concerns in this regard relate to her issues as a witness before me.

*Id.* The IJ then specified that she had two concerns regarding Ji's credibility; namely, that she was unresponsive to several questions at the merits hearing and that there was "an extremely material discrepancy between her testimony and her application." App. 36–38. The IJ did not find other flaws in Ji's application for asylum, stating that "considering the overall human rights record of the Chinese authorities in Tibet ... I will ... determine that if she were deemed to be credible, that I would conclude she has established a well-founded fear of persecution in Tibet." App. 41. The IJ even repeated this point, "if [Ji] were deemed to be credible ... I would conclude she has established her eligibility for asylum ... I would grant her asylum." *Id.*

In a brief order, the BIA adopted and affirmed the IJ's decision, finding that the IJ's "adverse credibility determination in this matter was not 'clearly erroneous'," and that the IJ "properly based her credibility finding on significant discrepancies [sic] in the record, the respondent's unresponsiveness to certain questions posed to her, as well as her evasiveness in response to other inquiries." App. 24.

We have exclusive jurisdiction to review final orders of removal, pursuant to section 242(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a), which provides the exclusive procedure for judicial review of all final removal orders.

## II.

### A.

A grant of asylum allows an alien who is otherwise subject to removal to stay in the United States because she is a refugee. *Abdulai v. Ashcroft,* 239 F.3d 542, 545 (3d Cir.2001). A refugee is someone who is unable or unwilling to return home because of persecution or a well-founded fear of persecution on one of several particular grounds. 8 U.S.C. § 1101(a)(42)(A). To establish a well-founded fear of persecution, an applicant must show a subjective fear as well as an objectively reasonable possibility that she would suffer such persecution if he returned to his country. *Chukwu v. Att'y Gen.,* 484 F.3d 185, 188 (3d Cir.2007).

Withholding of removal is a distinct remedy and confers only the right not to be deported to a particular country, rather than the right to stay in the United States. *Abdulai,* 239 F.3d at 545. An applicant can establish the right to withholding of removal by showing a clear probability that her life or freedom would be threatened on account of one of the protected grounds in the proposed country of removal, 8 C.F.R. § 1208.16(b); *Chen v. Gonzales,* 434 F.3d 212, 216 (3d Cir.2005). Because it is more difficult to prove a clear probability of persecution than a reasonable possibility, an applicant who fails to prove eligibility for asylum necessarily fails to show entitlement to withholding of removal. *See Kibinda v. Att'y Gen.,* 477 F.3d 113, 123 (3d Cir.2007).

Finally, an applicant can be eligible for withholding of removal under the CAT if she shows that it is more likely than not that she would be tortured upon return to her country. 8 C.F.R. § 1208.16(c).

Only the decision by the BIA is a "final order of removal" subject to our review.

*Abdulai*, 239 F.3d at 548–49. We therefore do not review the IJ's opinion, as such. *Id.* However, where as here, the BIA adopts the decision of the IJ, the IJ's opinion forms the substance of the final order and we must review it accordingly. *Id.* at 549 n. 2.

Where the BIA has adopted the IJ's findings, we review those findings under the substantial evidence standard, upholding them "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir.2003) (en banc). Accordingly, we will uphold the IJ's adverse credibility determinations "if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Chen*, 434 F.3d at 216. In making an adverse credibility finding, the IJ must supply specific, cogent reasons why the applicant is not credible. *Gabuniya v. Att'y Gen.*, 463 F.3d 316, 321 (3d Cir.2006). Additionally, "[w]hile we defer to the IJ on credibility questions, that deference is expressly conditioned on support in the record, as evidenced by specific findings," and an adverse credibility determination only "merits judicial approbation *as long as the findings on which it rests have sufficiently sturdy roots in the administrative record.*" *El Moraghy v. Ashcroft*, 331 F.3d 195, 205 (3d Cir.2003) (emphasis in original, internal quotation marks and citations omitted).

Under the REAL ID Act of 2005, credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Gabuniya*, 463 F.3d at 322 n. 7 (citing Pub. L. No. 109–13, Div. B, §§ 101(a)(3) & 101(h)(2)). Credibility determinations are to be based on the following considerations, set out in the REAL ID Act § 101(a), 119 Stat. 302, 303

(codified at INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii)):

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

Additionally, "there is no presumption of credibility." *Id.*

## B.

As noted above, the IJ based her adverse credibility determination on two considerations. First, the IJ deemed Ji "not always responsive to questions." App. 36. Second, the IJ found that there was "an extremely material discrepancy between [Ji's] testimony and her application." App. 38. We find that, upon closer examination, neither of these considerations, individually or in combination, are enough to support the IJ's adverse credibility determination. Accordingly, we find that the adverse credibility determination is not supported by reasonable, substantial, and probative evidence on the record considered as a whole.

### 1. Unresponsiveness to Questions

The IJ discussed several instances in which she perceived Ji to be unresponsive or evasive in answering questions. The IJ stated that Ji "answered the questions posed by her attorney in a direct manner" but that "during cross-examination and questions by the Court, she was not as responsive." App. 36. The IJ highlights four examples. The hearing transcript simply does not support the IJ's finding that Ji was unresponsive and evasive in answering questions. None of the four instances in which Ji was supposedly unresponsive or evasive withstand scrutiny.

The first example the IJ mentions is during the questioning regarding whether Ji had told her parents she was sending them the photos. The question Ji was asked was "[d]id you call them to tell them that you were going to be sending the photo?" App. 102. Ji responded: "I called to tell that after the completion of the year, I was returning. I told them that first I'm going to send a letter." *Id.* At this point, the IJ interrupted, stating "You haven't answered the question, ma'am. Would you like to?" App. 103. Ji replied: "I want to answer. Yes." She then proceeded to have the question restated and clarified, and to answer the question clearly and concisely. *Id.*

The second example the IJ noted was regarding the government attorney's questions concerning the date the police in Tibet visited Ji's family. This example, which will be discussed at length below in its relation to the discrepancy, is not an instance of evasive or unresponsive answering. From the transcript, it is apparent that Ji is not perfectly comfortable in English, but the government lawyer appeared to understand her answer well enough—it was the IJ who interrupted to state "[w]ell, that didn't answer the question, ma'am," App. 106, and who then re-

asked the question. When the question was repeated, Ji answered promptly and clearly.

The third example offered by the IJ was when the IJ was questioning how Ji obtained a passport. The IJ complained that Ji began her response by talking about something that wasn't relevant. The IJ felt that Ji was evasive in her response to how she obtained her visa, because she initially described an unrelated incident at her former school. Ji claims, however, that she misunderstood the inquiry, and upon repetition she answered more directly. Appellant's Br. 10, citing App. 110–11. Construing this as evasive is unwarranted, particularly given how responsive Ji was once the questions were reformulated and simplified.

The IJ's final example was that Ji was "not very responsive to my questions regarding the status of her employment in Tibet," claiming that Ji was "very evasive in answering me." App. 37, referencing App. 120–22. From the transcript, it is apparent that Ji simply did not understand the initial question. The IJ asks Ji about her prospective work situation in Tibet, given that she has been gone for a year, but the IJ phrases her question using the idiomatic phrase "leave of absence," which Ji clearly did not understand. App. 120. Ji says that though she did not officially quit her job, she "just left like that, something like that, it's not a definite thing." App. 120. At any rate, this discussion hardly evinces a respondent being "very evasive" in answering questions, as the IJ puts it, rather than someone who simply does not understand the questions being asked. Perhaps most relevantly, upon continued questioning, a clear answer emerges relatively quickly—Ji did not have anything official or formal lined up with her former employer regarding her future employment.

The REAL ID Act does establish that "a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness." 8 U.S.C. § 1158(b)(1)(B)(iii). Here, however, the examples cited by the IJ are simply instances of less than perfect comprehension and articulation. In each case, relatively clear answers to the questions asked emerge after the questions are repeated, simplified, or reformulated. This record simply cannot support the conclusion that Ji was being strategic, willfully evasive, or otherwise non-credible in answering questions.

Additionally, in assessing whether a respondent is being evasive or unresponsive, or is otherwise evincing a non-credible demeanor, IJs should take into account cultural difference between themselves and the witnesses. See, e.g., Zubeda v. Ashcroft, 333 F.3d 463, 476 (3d Cir.2003) (noting that "[c]aution is required because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is [not] burdened with the language difficulties . . . that may hamper communication" between a government agent and a petitioner); Dia, 353 F.3d at 273–80 (McKee, J., concurring in part and dissenting in part) (detailing the significant difficulties that can arise because of cross-cultural and linguistic difference). In this case, linguistic and cultural difference may be partly to blame for the communication breakdowns; it seems that at least part of the problem stemmed from unfamiliarity with certain cultural assumptions (regarding, for example, leaves of absence).

It is worth noting that Ji cannot be found non-credible simply because the IJ identified *several* instances in which she felt that Ji was evasive or non-responsive. As we have said before, "[n]umerous such instances do not . . . add up to a totality of circumstances that supports a finding that [petitioner's] testimony was not credible" because such instances may be "an aggregation of empty rationales that devolve into an unsupported finding of adverse credibility." Dia, 353 F.3d at 251.

For her part, the IJ does note that "[i]f the lack of responsiveness as a witness was the only problem from the respondent, the Court would be inclined to give her the benefit of the doubt that, perhaps, she is just not someone who likes to answer questions directly. . . ." App. 37. This makes it clear that this consideration was playing, at most, only a partial role in the IJ's adverse credibility determination. As the IJ noted, in her view, unresponsiveness "is not the only problem in [Ji's] case." App. 38.

### 2. Discrepancy

The other basis upon which IJ's adverse credibility finding rests is a single alleged discrepancy in Ji's account. The discrepancy concerns the precise time at which Chinese Government officials visited Ji's family in Tibet after having seen the letter containing the photograph. The IJ found that in Ji's application, she stated that the Chinese Government officials visited her family in October 2005, while at the hearing she stated that they visited in December 2005. Specifically, the IJ asserts that Ji "told the Government attorney that the officials had visited her family in December 2005 and expressed interest in the respondent, and, in fact, interrogated them about her. However, her statement . . . says 'an official from the public security bureau visited my family in October and told them that I must report to the PSB immediately upon my return to Tibet.'" App. 38. The IJ continued: "respondent attempted to correlate the different accounts by saying that the family was visit-

ed both in October and December by these officials, but the family was not home in October." *Id.* But the IJ was not satisfied by this "effort to explain this discrepancy" because

> her statement clearly says that the family was visited in October and told, then, that she must report to the public security bureau. There is no mention in her statement that there was a second visit by these officials where that information was conveyed. Her statement tells us of a visit in October only.

*Id.* The IJ noted that she "considers that to be an extremely material discrepancy between her testimony and her application" and that it went "to the heart of the claim, because it certainly goes to the issue of whether these officials are truly interested in her, and whether they truly visited the family." *Id.* The IJ complained that Ji's statement in support of her application was "not true," "not accurate," and "not complete," because "the officials did not speak to her family in October, as it says in the statement," and because "there is another visit where they did speak to them in December that is not there." App. 39.

As noted above, "[w]hile we defer to the IJ on credibility questions, that deference is expressly conditioned on support in the record, as evidenced by specific findings," and an adverse credibility determination only "merits judicial approbation as long as the findings on which it rests have sufficiently sturdy roots in the administrative record." *El Moraghy*, 331 F.3d at 205 (emphasis, internal quotation marks, and citations omitted). Additionally, as the Seventh Circuit Court of Appeals stated in *Giday v. Gonzales*, 434 F.3d 543, 551 (7th Cir.2006), "adverse credibility determinations should not be based upon easily explained discrepancies or perceived discrepancies."

The IJ identified only this one discrepancy between Ji's testimony and the statement she filed in support of her application. The IJ asserted that she was not satisfied by Ji's "effort to explain this discrepancy" because "her statement clearly says that the family was visited in October and told, then, that she must report to the public security bureau." *Id.* The exact language is worth reproducing, since the IJ appears to mischaracterize the two accounts:

> *Account One, from Statement:* "... I found an enclosed note from my mother. She revealed that the Chinese authorities had discovered my picture with His Holiness. An official from the Public Security Bureau visited my family in October and told them that I must report to the PSB immediately upon my return to Tibet. At this point, my family realized that they intended to arrest me." App. 143.

*Account Two, from Hearing:*

> Q [from Government counsel]: [W]hen did the police go to visit your family?
>
> A [Ji]: When I sent the mail, it was in October. And, at that time, they left. And, then, at the end of December, they have returned....
>
> IJ: Well, that didn't answer the question, ma'am. Do you want to answer when the police visited your family?
>
> A: End of December....
>
> Q [from Government Counsel]: Why is it, in your statement, ma'am, you say that, that the officials visited your family in October? And, in October, they told them that you needed to report to the public security bureau?
>
> A: When I received the, the letter, and, then, I knew that what was, that my parents mentioned for me to report in December.

Q: I, I still, I still don't understand. So, in your, in your statement, you say that the police visited your family in October, and told them that you needed to report immediately.

A: Well, this incident happened after I sent the mail. And, that is not a possibility.

Q: So, the police didn't go to your family in October?

A: In the October, when I sent the photographs, the Chinese authorities had visited the place. But, since there was nobody there, couldn't do anything.

IJ: I'm sorry. You said the authorities visited the home in October and December?

A: And, yes, and, in December, when my parents returned, they, they came again.

Q [from Government Counsel]: And, so, in October, they never spoke to your parents. Correct?

A: Not in October.

App. 106–07.

First, it must be noted that despite the IJ's assertion that Ji "has some facility in English" and that therefore the IJ "cannot find a credible explanation for that material discrepancy," App. 39, it is clear that Ji is not perfectly comfortable with English. Given how minor the discrepancy is, and that it stems entirely from one sentence in a five-page statement in support of her application that is otherwise unquestioned, it seems quite possible that the 'inconsistent' part of her application statement— "An official from the Public Security Bureau visited my family in October and told them that I must report to the PSB immediately upon my return to Tibet"—was simply an imprecisely written sentence. Logically speaking, what the sentence says is compatible with her hearing testimony.

The Public Security Bureau ("PSB") officials did visit her family in October and they did (eventually) tell them that Ji must report to them immediately upon her return to Tibet. Those facts are consistent with the rest of the account as gleaned from her testimony and the letter from her parents. What is inconsistent is just the implication that these two things happened close together in time, or at the same time, because she used the word 'and' and included them in the same sentence. In conversational English, we routinely use the word 'and' to express temporal proximity: "I went to the store and bought salad dressing" or "I paid my college tuition and attended class." But, as the latter example shows, it is possible to read such a sentence as expressing that two connected events took place, but these events need not be *temporally* connected, and they certainly need not be *contemporaneous* events. Sometimes sentences employing 'and' in this fashion will have the temporal implication, sometimes they will not. Someone with a limited command of English might not appreciate these kinds of linguistic subtleties. Additionally, there is evidence that Ji might be prone to make this particular 'mistake.' In her application, she also writes that "[i]n August 2004, I received this scholarship and was able to come to the United States" although Ji did not intend to suggest that she came to the United States in August 2004, and it is unquestioned that Ji did not come to the United States until September.

Even if we read Ji's statement as expressing that the PSB officials did meet her family in October, this one minor inaccuracy, given the clarification offered at the hearing (that the PSB officials tried to reach her family in October and failed, but succeeded in December), and given that this clarification is confirmed by the letter from her mother, is simply not enough on which to base an adverse credibility deter-

mination. Here, the discrepancy actually was explained by Ji in response to questioning, and this explanation is both plausible and supported by independent documentary evidence in the record (the letter from Ji's mother).[3]

The IJ's failure to offer a reasonable explanation why Ji's explanation of the discrepancy, supported by documentary evidence, should not be credited is all the more problematic because the IJ identifies no other instance of conflict or inconsistency between Ji's five-page statement, her extended hearing testimony, and the detailed letter from Ji's mother. This is in stark contrast to the case cited by the Government, *Tarrawally v. Ashcroft*, 338 F.3d 180, 183–84 (3d Cir.2003), in which the IJ identified *thirteen* discrepancies, conflicts, and omissions that resulted in the IJ finding the petitioner not credible. Additionally, the one discrepancy here does not concern a fact that Ji would have known to pay much attention to, or would

have any reason to misstate on purpose—after all, it does not matter to Ji's claim whether the PSB officials succeeded in reaching her parents in October or whether they tried, failed, and tried again and succeeded in December. It is true that discrepancies need not go to the "heart" of the claim, but it is hard to make much of the 'omission' of these details in Ji's statement. Again, this contrasts starkly with *Tarrawally*, in which the petitioner omitted to testify, consistent with his statement, that "he was cut with razor blades and beaten senseless when arrested." 338 F.3d at 184. The adverse credibility determination here simply does not have sufficiently sturdy roots in the administrative record.

We will remand for the IJ to re-examine credibility and her ruling in light of our rejection of her stated rationale, because "the proper course, except in rare circumstances, is to remand to the agency for

---

**3.** The IJ says that "I cannot conclude that the letter from the mother overcomes those deficiencies [in Ji's responses]," App. 40, but the IJ's explanation here is not convincing. The IJ says that because Ji had read her mother's letter prior to writing her statement, the discrepancy between her statement and her testimony at the hearing could not be cured by the letter. App. 39–40. But this makes no sense. If the misstatement in her statement was a result of confusion, discomfort with English, or even simple omission, then the explanation of this misstatement offered at the hearing, given that it comports with the letter, should be all the more compelling. If the IJ's picture is that Ji was trying to mislead or be untruthful in her application, this picture should be undermined by the fact that Ji offered a compelling explanation of the discrepancy at the hearing, and this explanation was not 'made up' on the spot to cover Ji's attempted deception, as it is supported by the mother's letter. The IJ also appears to mischaracterize the content of Ji's mother's letter, by saying that the letter "talks about some visit by local authorities to interrogate the parents" and that this "may be an indication that the moth-

er is telling us that there was a visit in October 2005, and a visit in December 2005." This is a bizarre way to characterize the letter, since in fact the letter is very explicit on this point. The letter is clear that Ji's parents were not home in October, but that they "later came to know that the local village government has send [sic] authorities to interrogate us" but that in December 2005, "people from the local government as well as the head of the local public security bureau came to our us [sic] and were asking about your whereabouts." App. 169.

The IJ never addresses whether she accepts the authenticity and veracity of the mother's letter and, indeed, seems to tacitly assume both authenticity and veracity when analyzing the alleged conflict in Ji's statement and testimony. Given the IJ's legal analysis, however, crediting the facts recited in the mother's letter would seem to lead logically to a grant of asylum. Based on the IJ's failure to grant asylum, we assume she failed to take the letter into account or perhaps she found the letter to be fraudulent, but failed to so note. We are left uncertain as to her view of the letter.

additional investigation or explanation." *INS v. Orlando Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam) (citation and quotation marks omitted).

### III.

Accordingly, we will grant the Petition for Review of the Order of the BIA, vacate the Order, and remand for further proceedings consistent with this opinion.