NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1013
_____

SHIN YUNG YANG,
                                                    Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                                    Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A98-574-599)
Immigration Judge:  Honorable Eugene Pugliese

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 19, 2011

Before:  FUENTES, VANASKIE and NYGAARD, Circuit Judges

(Opinion filed: February 10, 2011)
_____

OPINION
_____

PER CURIAM

        Shin Yung Yang, a citizen of China, arrived in the United States in December

2004.  He conceded that he was removable for entering without a valid entry document.

See Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I) [8 U.S.C.

§ 1182(a)(7)(i)(I)].  Yang applied for asylum, withholding of removal, and for protection under the United Nations Convention Against Torture, claiming that he was persecuted under China's coercive family planning policies.

Yang appeared before an Immigration Judge ("IJ") and testified that, following the birth of a son in 1998, family planning officials forced his wife to have an IUD inserted.  In September 2004, those officials discovered during a checkup that Yang's wife was pregnant and demanded that she have an abortion.  Instead of reporting to the officials, however, the couple immediately went to hide at the home of Yang's wife's aunt.  The officials came to Yang's home to arrest him and his wife; they also imposed a fine of 20,000 RMB.  Yang remained in hiding for approximately one month before departing for the United States.  After he left, the family planning officials found his wife, took her to the city hospital, and forced her to have an abortion.

The IJ denied Yang's applications, concluding that he was not credible.  The Board of Immigration Appeals ("BIA") agreed with the IJ that Yang's testimony was "non-responsive, evasive, and implausible," that he had to make "numerous corrections resulting in some inconsistencies to his original asylum application and statement in support of that application," and that "there was reason to suspect [Yang's] documentary evidence."  Consequently, the BIA dismissed Yang's appeal.  Yang filed a timely petition for review.

We have jurisdiction under INA § 242 [8 U.S.C. § 1252].  Because the BIA adopted the findings of the IJ and also commented on the sufficiency of the IJ's determinations, this Court reviews the decisions of both the BIA and the IJ.  See Kaita v.

2

Att'y Gen., 522 F.3d 288, 296 (3d Cir. 2008). Our review of these decisions is for substantial evidence, considering whether they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Lin-Zheng v. Att'y Gen., 557 F.3d 147, 155 (3d Cir. 2009) (en banc) (internal citation omitted). We will uphold an adverse credibility determination under the substantial evidence standard "'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Lin v. Att'y Gen., 543 F.3d 114, 119 (3d Cir. 2008) (internal citation omitted). Adverse credibility determinations based on speculation or conjecture, rather than on record evidence, are reversible. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Because Yang filed his asylum application after May 11, 2005, the provisions of the REAL ID Act governing credibility determinations in asylum applications apply. See Chukwu v. Att'y Gen., 484 F.3d 185, 189 (3d Cir.2007). Under the REAL ID Act, an IJ may base a credibility determination on observations of the applicant's demeanor, candor, or responsiveness, the inherent plausibility of the applicant's story, the consistency of the applicant's statements, and any inaccuracies or falsehoods in such statements. See INA § 208(b)(1)(B)(iii) [8 U.S.C. § 1158(b)(1)(B)(iii)]; see also Gabuniya v. Att'y Gen., 463 F.3d 316, 322 n.7 (3d Cir. 2006).

After careful review of the record, we conclude that the adverse credibility determination is not supported by substantial evidence. In this case, the IJ criticized the manner in which Yang testified, observing that he "did not give the appearance to the Court of someone who was telling the truth." Although we accord significant deference to personal observations of demeanor by an IJ, see Dia v. Ashcroft, 353 F.3d 228, 252 n.

3

23 (3d Cir. 2003) (en banc), we do not agree that Yang's testimony was "evasive" and "not responsive." For instance, there is no support for the IJ's criticism of Yang's answers on direct examination to questions about whether he knew if anything had happened to his wife since his departure from China. Yang testified that his wife "told me that on December 20 . . ., -- she didn't know who report[ed her] to the family planning officials, but family planning officials burst into her . . . aunt's house and took her away, no matter how she begged." Yang then indicated that his wife "was taken to the city hospital to have [an] abortion." When asked if his wife had described what happened, Yang stated, "I – when I talk to her on the phone she was crying and I know how she feels, so I cannot ask too much." Yang then responded affirmatively when his attorney asked, "did they perform the abortion on her?" We do not believe that this testimony was nonresponsive. The IJ stated that he "would expect . . .some sort of narrative flow to this story" and "would prefer a rambling discourse to one that provides brief answers, . . . to questions that lead him step by step along in the exact sequence of the written statement . . . ." Those expectations and preferences notwithstanding, Yang provided clear answers to his attorney's questions, and reasonably explained that he did not ask his wife for details about events surrounding the abortion because he did not want to upset her.

The IJ also faulted Yang for his "evasive" answers on cross-examination. In particular, the IJ noted that "what [Yang] did on cross-examination, when counsel for Homeland Security asked questions, was to ask his own questions in response." A review of the transcript reveals, however, that in each of those instances, Yang was

4

simply asking the Government attorney to clarify or repeat the question. Once Yang understood the question, he answered directly. The IJ also found it implausible that family planning officials had not attempted to collect the 20,000 RMB fine, stating that "[i]f they are serious about these birth control policies, . . . then one would think they would be equally forceful and committed to the question of collection of fines that are outstanding." This is mere speculation, however. There is also no clear support in the record for the IJ's determination that Yang and his wife "were supposed to have the abortion and the fine, not an either/or situation." More importantly, though, contrary to the IJ's conclusion, Yang did not state that officials had made no effort to collect the fine. Rather, when asked whether "anyone from the government [has] spoken to your wife . . . since she was allegedly aborted on December 20, 2004," Yang replied, "I don't know." He clarified that while he had spoken to his wife many times, "we did not have [a] discussion on whether the government official came to talk to her."[1]

The Board affirmed the IJ's adverse credibility finding in part based on "the fact that [Yang] made numerous corrections resulting in some inconsistencies to his original asylum application and statement in support of that application." In his original written statement, Yang indicated that his wife was required to have IUD check-ups *twice* a year, that he left China on November 25, 2005, and that he and his wife "went to hide at *my aunt's* house." (emphasis added). Yang made three changes to this statement. The first two changes were submitted in a written "Statement with Minor Correction," wherein

---

[1] Notably, Yang's wife submitted a letter, dated April 12, 2005, in which she stated, "[t]ill now, the village officers and family planning officials always go to my house to

5

Yang clarified that his wife was required to have IUD check-ups *three* times a year and that he left China on November 25, 200*4*. Yang's attorney made a third correction at beginning of the merits hearing, noting that Yang had hidden at his *wife's* aunt's house. Importantly, however, Yang made the changes prior to testifying about his experiences, and then testified consistently with his amendment statement. Indeed, he stated that he arrived in the United States in 2004, that his wife was required to "have checkup every four months," and that "me and my wife went to my wife's aunt's home to hide." Under the circumstances, we conclude that the mistakes and omission in Yang's original asylum statement, which he prudently corrected, do not support the adverse credibility determination.[2]

The Board also concluded that "there was reason to suspect [Yang's] documentary evidence." Similarly, the IJ "wonder[ed] about the authenticity" of the evidence, citing a State Department report about widespread document fabrication in China. Notably, however, neither the BIA nor the IJ identified which of Yang's documents were suspect. Moreover, we have held that failure to follow the administrative authentication procedure does not result in a per se exclusion of documentary evidence, and a petitioner is

---

look for [Yang]."
[2] The IJ also seemingly faulted Yang because his asylum statement was only one-page long and because the events giving rise to his claim occurred over a "relatively brief period of time, that is to say, the time between his wife's having her September 24 IUD checkup and then [Yang's] leaving China and then his wife's having an abortion later that same year." There is no requirement, however, that asylum statements span a certain number of pages or that the alleged persecution be prolonged. The IJ also noted that Yang's asylum statement stated that Yang would be jailed for two or three months, but that he testified that he could be jailed for longer than three months because "[i]t's different in case by case." We conclude that Yang's clarification regarding a predicted

permitted to prove authenticity in another manner. <u>Liu v. Ashcroft</u>, 372 F.3d 529, 533 (3d Cir. 2004). The IJ also relied on Yang's failure to provide an envelope for certain documents supposedly obtained by his wife in China. Yang testified, however, that his wife mailed the documents to him, that he provided them directly to his lawyer, and that he did not save the envelope because he was unaware that he would need to keep it. We disagree with the IJ that this explanation "does not seem to make any sense." <u>Cf. Marynenka v. Holder</u>, 592 F.3d 594, 601 (4th Cir. 2010) (noting that "with respect to the chain of custody, the rules of evidence do not apply strictly in administrative adjudications of immigration cases, and here the immigration judge . . . offer[ed] no other [valid] reason to doubt the authenticity of the document" (internal quotation marks omitted)).

For the foregoing reasons, we will grant the petition for review, vacate the BIA's order of December 16, 2009, and remand to the Board to determine, without regard to the erroneous adverse credibility findings described above, whether Yang is entitled to relief.

---

imprisonment term does not adequately support the adverse credibility determination.

7